(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UTILITY AIR REGULATORY GROUP *v.* ENVIRONMENTAL PROTECTION AGENCY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 12–1146. Argued February 24, 2014—Decided June 23, 2014 *

The Clean Air Act imposes permitting requirements on stationary sources, such as factories and powerplants. The Act's "Prevention of Significant Deterioration" (PSD) provisions make it unlawful to construct or modify a "major emitting facility" in "any area to which [the PSD program] applies" without a permit. §§7475(a)(1), 7479(2)(C). A "major emitting facility" is a stationary source with the potential to emit 250 tons per year of "any air pollutant" (or 100 tons per year for certain types of sources). §7479(1). Facilities seeking to qualify for a PSD permit must, *inter alia,* comply with emissions limitations that reflect the "best available control technology" (BACT) for "each pollutant subject to regulation under" the Act. §7475(a)(4). In addition, Title V of the Act makes it unlawful to operate any "major source," wherever located, without a permit. §7661a(a). A "major source" is a stationary source with the potential to emit 100 tons per year of "any air pollutant." §§7661(2)(B), 7602(j).

In response to *Massachusetts* v. *EPA*, 549 U. S. 497, EPA promulgated greenhouse-gas emission standards for new motor vehicles, and

_____

* Together with No. 12–1248, *American Chemistry Council et al.* v. *Environmental Protection Agency et al.,* No. 12–1254, *Energy-Intensive Manufacturers Working Group on Greenhouse Gas Regulation et al.* v. *Environmental Protection Agency et al.,* No. 12–1268, *Southeastern Legal Foundation, Inc., et al.* v. *Environmental Protection Agency et al.,* No. 12–1269, *Texas et al.* v. *Environmental Protection Agency et al.,* and No. 12–1272, *Chamber of Commerce of United States States et al.* v. *Environmental Protection Agency et al.,* also on certiorari to the same court.

made stationary sources subject to the PSD program and Title V on the basis of their potential to emit greenhouse gases. It recognized, however, that requiring permits for all sources with greenhouse-gas emissions above the statutory thresholds would radically expand those programs and render them unadministrable. So EPA purported to "tailor" the programs to accommodate greenhouse gases by providing, among other things, that sources would not become newly subject to PSD or Title V permitting on the basis of their potential to emit greenhouse gases in amounts less than 100,000 tons per year.

Numerous parties, including several States, challenged EPA's actions in the D. C. Circuit, which dismissed some of the petitions for lack of jurisdiction and denied the remainder.

*Held*: The judgment is affirmed in part and reversed in part.

684 F. 3d 102, affirmed in part and reversed in part.

JUSTICE SCALIA delivered the opinion of the Court with respect to Parts I and II, concluding:

1. The Act neither compels nor permits EPA to adopt an interpretation of the Act requiring a source to obtain a PSD or Title V permit on the sole basis of its potential greenhouse-gas emissions. Pp. 10–24.

(a) The Act does not compel EPA's interpretation. *Massachusetts* held that the Act-wide definition of "air pollutant" includes greenhouse gases, 549 U. S., at 529, but where the term "air pollutant" appears in the Act's operative provisions, including the PSD and Title V permitting provisions, EPA has routinely given it a narrower, context-appropriate meaning. *Massachusetts* did not invalidate those longstanding constructions. The Act-wide definition is not a command to regulate, but a description of the universe of substances EPA may consider regulating under the Act's operative provisions. Though Congress's profligate use of "air pollutant" is not conducive to clarity, the presumption of consistent usage " 'readily yields' " to context, and a statutory term "may take on distinct characters from association with distinct statutory objects calling for different implementation strategies." *Environmental Defense* v. *Duke Energy Corp.*, 549 U. S. 561, 574. Pp. 10–16.

(b) Nor does the Act permit EPA's interpretation. Agencies empowered to resolve statutory ambiguities must operate "within the bounds of reasonable interpretation," *Arlington* v. *FCC*, 569 U. S. ___, ___. EPA has repeatedly acknowledged that applying the PSD and Title V permitting requirements to greenhouse gases would be inconsistent with the Act's structure and design. A review of the relevant statutory provisions leaves no doubt that the PSD program and Title V are designed to apply to, and cannot rationally be extended beyond, a relative handful of large sources capable of shouldering heavy sub-

stantive and procedural burdens. EPA's interpretation would also bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization. *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 160. Pp. 16–20.

(c) EPA lacked authority to "tailor" the Act's unambiguous numerical thresholds of 100 or 250 tons per year to accommodate its greenhouse-gas-inclusive interpretation of the permitting triggers. Agencies must always " 'give effect to the unambiguously expressed intent of Congress.' " *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 665. The power to execute the laws does not include a power to revise clear statutory terms that turn out not to work in practice. Pp. 20–24.

2. EPA reasonably interpreted the Act to require sources that would need permits based on their emission of conventional pollutants to comply with BACT for greenhouse gases. Pp. 24–29.

(a) Concerns that BACT, which has traditionally been about end-of-stack controls, is fundamentally unsuited to greenhouse-gas regulation, which is more about energy use, are not unfounded. But an EPA guidance document states that BACT analysis should consider options other than energy efficiency, including "carbon capture and storage," which EPA contends is reasonably comparable to more traditional, end-of-stack BACT technologies. Moreover, assuming that BACT may be used to force improvements in energy efficiency, important limitations on BACT may work to mitigate concerns about "unbounded" regulatory authority. Pp. 24–27.

(b) EPA's decision to require BACT for greenhouse gases emitted by sources otherwise subject to PSD review is, as a general matter, a permissible interpretation of the statute under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837. The specific phrasing of the BACT provision—which requires BACT "for each pollutant subject to regulation under" the Act, §7475(a)(4)—does not suggest that the provision can bear a narrowing construction. And even if the text were not clear, applying BACT to greenhouse gases is not so disastrously unworkable, and need not result in such a dramatic expansion of agency authority, as to make EPA's interpretation unreasonable. Pp. 27–29.

SCALIA, J., announced the judgment of the Court and delivered an opinion, Parts I and II of which were for the Court. ROBERTS, C. J., and KENNEDY, J., joined that opinion in full; THOMAS and ALITO, JJ., joined as to Parts I, II–A, and II–B–1; and GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined as to Part II–B–2. BREYER J., filed an opinion concurring in part and dissenting in part, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed an opinion concurring in part and dissenting in part, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 12–1146, 12–1248, 12–1254, 12–1268, 12–1269, and 12–1272

---

UTILITY AIR REGULATORY GROUP,
PETITIONER
12–1146                    *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


AMERICAN CHEMISTRY COUNCIL, ET AL.,
PETITIONERS
12–1248                    *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


ENERGY-INTENSIVE MANUFACTURERS WORKING
GROUP ON GREENHOUSE GAS REGULATION,
ET AL., PETITIONERS
12–1254                    *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


SOUTHEASTERN LEGAL FOUNDATION, INC.,
ET AL., PETITIONERS
12–1268                    *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


TEXAS, ET AL., PETITIONERS
12–1269                    *v.*
ENVIRONMENTAL PROTECTION AGENCY,
ET AL.; AND

## CHAMBER OF COMMERCE OF THE UNITED STATES, ET AL., PETITIONERS

12–1272                    *v.*

## ENVIRONMENTAL PROTECTION AGENCY, ET AL.;

*ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

[June 23, 2014]

JUSTICE SCALIA announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II.

Acting pursuant to the Clean Air Act, 69 Stat. 322, as amended, 42 U. S. C. §§7401–7671q, the Environmental Protection Agency recently set standards for emissions of "greenhouse gases" (substances it believes contribute to "global climate change") from new motor vehicles. We must decide whether it was permissible for EPA to determine that its motor-vehicle greenhouse-gas regulations automatically triggered permitting requirements under the Act for stationary sources that emit greenhouse gases.

### I. Background
### A. Stationary-Source Permitting

The Clean Air Act regulates pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft. This litigation concerns permitting obligations imposed on stationary sources under Titles I and V of the Act.

Title I charges EPA with formulating national ambient air quality standards (NAAQS) for air pollutants. §§7408–7409. To date, EPA has issued NAAQS for six pollutants: sulfur dioxide, particulate matter, nitrogen dioxide, carbon monoxide, ozone, and lead. Clean Air Act Handbook 125 (J. Domike & A. Zacaroli eds., 3d ed. 2011); see generally 40 CFR pt. 50 (2013). States have primary responsibility

for implementing the NAAQS by developing "State implementation plans." 42 U. S. C. §7410. A State must designate every area within its borders as "attainment," "nonattainment," or "unclassifiable" with respect to each NAAQS, §7407(d), and the State's implementation plan must include permitting programs for stationary sources that vary according to the classification of the area where the source is or is proposed to be located. §7410(a)(2)(C), (I).

Stationary sources in areas designated attainment or unclassifiable are subject to the Act's provisions relating to "Prevention of Significant Deterioration" (PSD). §§7470–7492. EPA interprets the PSD provisions to apply to sources located in areas that are designated attainment or unclassifiable for *any* NAAQS pollutant, regardless of whether the source emits that specific pollutant. Since the inception of the PSD program, every area of the country has been designated attainment or unclassifiable for at least one NAAQS pollutant; thus, on EPA's view, all stationary sources are potentially subject to PSD review.

It is unlawful to construct or modify a "major emitting facility" in "any area to which [the PSD program] applies" without first obtaining a permit. §§7475(a)(1), 7479(2)(C). To qualify for a permit, the facility must not cause or contribute to the violation of any applicable air-quality standard, §7475(a)(3), and it must comply with emissions limitations that reflect the "best available control technology" (or BACT) for "each pollutant subject to regulation under" the Act. §7475(a)(4). The Act defines a "major emitting facility" as any stationary source with the potential to emit 250 tons per year of "any air pollutant" (or 100 tons per year for certain types of sources). §7479(1). It defines "modification" as a physical or operational change that causes the facility to emit more of "any air pollutant."

§7411(a)(4).[1]

In addition to the PSD permitting requirements for construction and modification, Title V of the Act makes it unlawful to *operate* any "major source," wherever located, without a comprehensive operating permit. §7661a(a). Unlike the PSD program, Title V generally does not impose any substantive pollution-control requirements. Instead, it is designed to facilitate compliance and enforcement by consolidating into a single document all of a facility's obligations under the Act. The permit must include all "emissions limitations and standards" that apply to the source, as well as associated inspection, monitoring, and reporting requirements. §7661c(a)–(c). Title V defines a "major source" by reference to the Act-wide definition of "major stationary source," which in turn means any stationary source with the potential to emit 100 tons per year of "any air pollutant." §§7661(2)(B), 7602(j).

### B. EPA's Greenhouse-Gas Regulations

In 2007, the Court held that Title II of the Act "authorize[d] EPA to regulate greenhouse gas emissions from new motor vehicles" if the Agency "form[ed] a 'judgment' that

---

[1] Although the statute sets numerical thresholds (100 or 250 tons per year) for emissions that will make a facility "major," it does not specify by how much a physical or operational change must increase emissions to constitute a permit-requiring "modification." Nor does it say how much of a given regulated pollutant a "major emitting facility" must emit before it is subject to BACT for that pollutant. EPA, however, has established pollutant-specific numerical thresholds below which a facility's emissions of a pollutant, and increases therein, are considered *de minimis* for those purposes. See 40 CFR §§51.166(b)(2)(i), (23), (39), (j)(2)–(3), 52.21(b)(2)(i), (23), (40), (j)(2)–(3); see also *Alabama Power Co.* v. *Castle*, 636 F. 2d 323, 360–361, 400, 405 (CADC 1979) (recognizing this authority in EPA); cf. *Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co.*, 505 U. S. 214, 231 (1992) ("*[D]e minimis non curat lex* . . . is part of the established background of legal principles against which all enactments are adopted").

such emissions contribute to climate change." *Massachu-setts* v. *EPA*, 549 U. S. 497, 528 (quoting §7521(a)(1)). In response to that decision, EPA embarked on a course of regulation resulting in "the single largest expansion in the scope of the [Act] in its history." Clean Air Act Handbook, at xxi.

EPA first asked the public, in a notice of proposed rule-making, to comment on how the Agency should respond to *Massachusetts*. In doing so, it explained that regulating greenhouse-gas emissions from motor vehicles could have far-reaching consequences for stationary sources. Under EPA's view, once greenhouse gases became regulated under any part of the Act, the PSD and Title V permitting requirements would apply to all stationary sources with the potential to emit greenhouse gases in excess of the statutory thresholds: 100 tons per year under Title V, and 100 or 250 tons per year under the PSD program depend-ing on the type of source. 73 Fed. Reg. 44420, 44498, 44511 (2008). Because greenhouse-gas emissions tend to be "orders of magnitude greater" than emissions of con-ventional pollutants, EPA projected that numerous small sources not previously regulated under the Act would be swept into the PSD program and Title V, including "smaller industrial sources," "large office and residential build-ings, hotels, large retail establishments, and similar facili-ties." *Id.,* at 44498–44499. The Agency warned that this would constitute an "unprecedented expansion of EPA authority that would have a profound effect on virtually every sector of the economy and touch every household in the land," yet still be "relatively ineffective at reducing greenhouse gas concentrations." *Id.,* at 44355.[2]

―――――――

[2] Comments from other Executive Branch agencies reprinted in the notice echoed those concerns. See, *e.g.,* 73 Fed. Reg. 44360 (Depart-ments of Agriculture, Commerce, Transportation, and Energy noting EPA would "exercis[e] de facto zoning authority through control over thousands of what formerly were local or private decisions, impacting

In 2009, EPA announced its determination regarding the danger posed by motor-vehicle greenhouse-gas emissions. EPA found that greenhouse-gas emissions from new motor vehicles contribute to elevated atmospheric concentrations of greenhouse gases, which endanger public health and welfare by fostering global "climate change." 74 Fed. Reg. 66523, 66537 (hereinafter Endangerment Finding). It denominated a "single air pollutant" the "combined mix" of six greenhouse gases that it identified as "the root cause of human-induced climate change": carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. *Id.,* at 66516, 66537. A source's greenhouse-gas emissions would be measured in "carbon dioxide equivalent units" ($CO_2e$), which would be calculated based on each gas's "global warming potential." *Id.,* at 66499, n. 4.

Next, EPA issued its "final decision" regarding the prospect that motor-vehicle greenhouse-gas standards would trigger stationary-source permitting requirements. 75 Fed. Reg. 17004 (2010) (hereinafter Triggering Rule). EPA announced that beginning on the effective date of its greenhouse-gas standards for motor vehicles, stationary sources would be subject to the PSD program and Title V on the basis of their potential to emit greenhouse gases. As expected, EPA in short order promulgated greenhouse-gas emission standards for passenger cars, light-duty

---

the construction of schools, hospitals, and commercial and residential development"); *id.,* at 44383 (Council of Economic Advisers and Office of Science and Technology Policy stating that "[s]mall manufacturing facilities, schools, and shopping centers" would be subject to "full major source permitting"); *id.,* at 44385 (Council on Environmental Quality noting "the prospect of essentially automatic and immediate regulation over a vast range of community and business activity"); *id.,* at 44391 (Small Business Administration finding it "difficult to overemphasize how potentially disruptive and burdensome such a new regulatory regime would be to small entities" such as "office buildings, retail establishments, hotels, . . . schools, prisons, and private hospitals").

trucks, and medium-duty passenger vehicles to take effect on January 2, 2011. 75 Fed. Reg. 25324 (hereinafter Tailpipe Rule).

EPA then announced steps it was taking to "tailor" the PSD program and Title V to greenhouse gases. 75 Fed. Reg. 31514 (hereinafter Tailoring Rule). Those steps were necessary, it said, because the PSD program and Title V were designed to regulate "a relatively small number of large industrial sources," and requiring permits for all sources with greenhouse-gas emissions above the statutory thresholds would radically expand those programs, making them both unadministrable and "unrecognizable to the Congress that designed" them. *Id.,* at 31555, 31562. EPA nonetheless rejected calls to exclude greenhouse gases entirely from those programs, asserting that the Act is not "ambiguous with respect to the need to cover [greenhouse-gas] sources under either the PSD or title V program." *Id.,* at 31548, n. 31. Instead, EPA adopted a "phase-in approach" that it said would "appl[y] PSD and title V at threshold levels that are as close to the statutory levels as possible, and do so as quickly as possible, at least to a certain point." *Id.,* at 31523.

The phase-in, EPA said, would consist of at least three steps. During Step 1, from January 2 through June 30, 2011, no source would become newly subject to the PSD program or Title V solely on the basis of its greenhouse-gas emissions; however, sources required to obtain permits anyway because of their emission of conventional pollutants (so-called "anyway" sources) would need to comply with BACT for greenhouse gases if they emitted those gases in significant amounts, defined as at least 75,000 tons per year $CO_2e$. *Ibid.* During Step 2, from July 1, 2011, through June 30, 2012, sources with the potential to emit at least 100,000 tons per year $CO_2e$ of greenhouse gases would be subject to PSD and Title V permitting for their construction and operation and to PSD permitting

for modifications that would increase their greenhouse-gas emissions by at least 75,000 tons per year $CO_2e$. *Id.,* at 31523–31524.[3] At Step 3, beginning on July 1, 2013, EPA said it might (or might not) further reduce the permitting thresholds (though not below 50,000 tons per year $CO_2e$), and it might (or might not) establish permanent exemptions for some sources. *Id.,* at 31524. Beyond Step 3, EPA promised to complete another round of rulemaking by April 30, 2016, in which it would "take further action to address small sources," which might (or might not) include establishing permanent exemptions. *Id.,* at 31525.

EPA codified Steps 1 and 2 at 40 CFR §§51.166(b)(48) and 52.21(b)(49) for PSD and at §§70.2 and 71.2 for Title V, and it codified its commitments regarding Step 3 and beyond at §§52.22, 70.12, and 71.13. See Tailoring Rule 31606–31608. After the decision below, EPA issued its final Step 3 rule, in which it decided not to lower the thresholds it had established at Step 2 until at least 2016. 77 Fed. Reg. 41051 (2012).

## C. Decision Below

Numerous parties, including several States, filed petitions for review in the D. C. Circuit under 42 U. S. C. §7607(b), challenging EPA's greenhouse-gas-related actions. The Court of Appeals dismissed some of the petitions for lack of jurisdiction and denied the remainder. *Coalition for Responsible Regulation, Inc.* v. *EPA*, 684 F. 3d 102 (2012) (*per curiam*). First, it upheld the Endangerment Finding and Tailpipe Rule. *Id.,* at 119, 126. Next, it held that EPA's interpretation of the PSD permitting requirement as applying to "any regulated air pollu-

_____

[3] EPA stated that its adoption of a 75,000-tons-per-year threshold for emissions requiring BACT and modifications requiring permits was not an exercise of its authority to establish *de minimis* exceptions and that a truly *de minimis* level might be "well below" 75,000 tons per year. Tailoring Rule 31560; cf. n. 1, *supra.*

tant," including greenhouse gases, was "compelled by the statute." *Id.,* at 133–134. The court also found it "crystal clear that PSD permittees must install BACT for greenhouse gases." *Id.,* at 137. Because it deemed petitioners' arguments about the PSD program insufficiently applicable to Title V, it held they had "forfeited any challenges to EPA's greenhouse gas-inclusive interpretation of Title V." *Id.,* at 136. Finally, it held that petitioners were without Article III standing to challenge EPA's efforts to limit the reach of the PSD program and Title V through the Triggering and Tailoring Rules. *Id.,* at 146. The court denied rehearing en banc, with Judges Brown and Kavanaugh each dissenting. No. 09–1322 etc. (Dec. 20, 2012), App. 139, 2012 WL 6621785.

We granted six petitions for certiorari but agreed to decide only one question: "'Whether EPA permissibly determined that its regulation of greenhouse gas emissions from new motor vehicles triggered permitting requirements under the Clean Air Act for stationary sources that emit greenhouse gases.'" 571 U. S. ____ (2013).

## II. Analysis

This litigation presents two distinct challenges to EPA's stance on greenhouse-gas permitting for stationary sources. First, we must decide whether EPA permissibly determined that a source may be subject to the PSD and Title V permitting requirements on the sole basis of the source's potential to emit greenhouse gases. Second, we must decide whether EPA permissibly determined that a source already subject to the PSD program because of its emission of conventional pollutants (an "anyway" source) may be required to limit its greenhouse-gas emissions by employing the "best available control technology" for greenhouse gases. The Solicitor General joins issue on both points but evidently regards the second as more important; he informs us that "anyway" sources account

for roughly 83% of American stationary-source greenhouse-gas emissions, compared to just 3% for the additional, non-"anyway" sources EPA sought to regulate at Steps 2 and 3 of the Tailoring Rule. Tr. of Oral Arg. 52.

We review EPA's interpretations of the Clean Air Act using the standard set forth in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). Under *Chevron*, we presume that when an agency-administered statute is ambiguous with respect to what it prescribes, Congress has empowered the agency to resolve the ambiguity. The question for a reviewing court is whether in doing so the agency has acted reasonably and thus has "stayed within the bounds of its statutory authority." *Arlington* v. *FCC*, 569 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 5) (emphasis deleted).

## A. The PSD and Title V Triggers

We first decide whether EPA permissibly interpreted the statute to provide that a source may be required to obtain a PSD or Title V permit on the sole basis of its potential greenhouse-gas emissions.

### 1

EPA thought its conclusion that a source's greenhouse-gas emissions may necessitate a PSD or Title V permit followed from the Act's unambiguous language. The Court of Appeals agreed and held that the statute "compelled" EPA's interpretation. 684 F. 3d, at 134. We disagree. The statute compelled EPA's greenhouse-gas-inclusive interpretation with respect to neither the PSD program nor Title V.[4]

---

[4] The Court of Appeals held that petitioners' arguments applied only to the PSD program and that petitioners had therefore "forfeited any challenges to EPA's greenhouse gas-inclusive interpretation of Title V." 684 F. 3d, at 136. The Solicitor General does not defend the Court of Appeals' ruling on forfeiture, and he concedes that some of the argu-

The Court of Appeals reasoned by way of a flawed syllogism: Under *Massachusetts*, the general, Act-wide definition of "air pollutant" includes greenhouse gases; the Act requires permits for major emitters of "any air pollutant"; therefore, the Act requires permits for major emitters of greenhouse gases. The conclusion follows from the premises only if the air pollutants referred to in the permit-requiring provisions (the minor premise) are the same air pollutants encompassed by the Act-wide definition as interpreted in *Massachusetts* (the major premise). Yet no one—least of all EPA—endorses that proposition, and it is obviously untenable.

The Act-wide definition says that an air pollutant is "any air pollution agent or combination of such agents, including any physical, chemical, biological, [or] radioactive . . . substance or matter which is emitted into or otherwise enters the ambient air." §7602(g). In *Massachusetts*, the Court held that the Act-wide definition includes greenhouse gases because it is all-encompassing; it "embraces all airborne compounds of whatever stripe." 549 U. S., at 529. But where the term "air pollutant" appears in the Act's operative provisions, EPA has routinely given it a narrower, context-appropriate meaning.

That is certainly true of the provisions that require PSD and Title V permitting for major emitters of "any air pollutant." Since 1978, EPA's regulations have interpreted "air pollutant" in the PSD permitting trigger as limited to *regulated* air pollutants, 43 Fed. Reg. 26403, codified, as amended, 40 CFR §52.21(b)(1)–(2), (50)—a class much narrower than *Massachusetts*' "all airborne compounds of

—————

ments petitioners have made before this Court apply to Title V as well as the PSD program. See Brief for Federal Respondents 56. We agree, and we are satisfied that those arguments were also made below. See, *e.g.,* Brief for State Petitioners et al. in No. 10–1073 etc. (CADC), pp. 59–73; Brief for Non-State Petitioners et al. in No. 10–1073 etc. (CADC), pp. 46–47.

whatever stripe," 549 U. S., at 529. And since 1993 EPA has informally taken the same position with regard to the Title V permitting trigger, a position the Agency ultimately incorporated into some of the regulations at issue here. See Memorandum from Lydia N. Wegman, Deputy Director, Office of Air Quality Planning and Standards, to Air Division Director, Regions I–X, pp. 4–5 (Apr. 26, 1993); Tailoring Rule 31607–31608 (amending 40 CFR §§70.2, 71.2). Those interpretations were appropriate: It is plain as day that the Act does not envision an elaborate, burdensome permitting process for major emitters of steam, oxygen, or other harmless airborne substances. It takes some cheek for EPA to insist that it cannot possibly give "air pollutant" a reasonable, context-appropriate meaning in the PSD and Title V contexts when it has been doing precisely that for decades.

Nor are those the only places in the Act where EPA has inferred from statutory context that a generic reference to air pollutants does not encompass every substance falling within the Act-wide definition. Other examples abound:

- The Act authorizes EPA to enforce new source performance standards (NSPS) against a pre-existing source if, after promulgation of the standards, the source undergoes a physical or operational change that increases its emission of "any air pollutant." §7411(a)(2), (4), (b)(1)(B). EPA interprets that provision as limited to air pollutants *for which EPA has promulgated new source performance standards.* 36 Fed. Reg. 24877 (1971), codified, as amended, 40 CFR §60.2; 40 Fed. Reg. 58419 (1975), codified, as amended, 40 CFR §60.14(a).

- The Act requires a permit for the construction or operation in a nonattainment area of a source with the potential to emit 100 tons per year of "any air

pollutant." §§7502(c)(5), 7602(j). EPA interprets that provision as limited to pollutants *for which the area is designated nonattainment.* 45 Fed. Reg. 52745 (1980), promulgating 40 CFR §51.18(j)(2), as amended, §51.165(a)(2).

- The Act directs EPA to require "enhanced monitoring and submission of compliance certifications" for any source with the potential to emit 100 tons per year of "any air pollutant." §§7414(a)(3), 7602(j). EPA interprets that provision as limited to *regulated* pollutants. 62 Fed. Reg. 54941 (1997), codified at 40 CFR §§64.1, 64.2.

- The Act requires certain sources of air pollutants that interfere with visibility to undergo retrofitting if they have the potential to emit 250 tons per year of "any pollutant." §7491(b)(2)(A), (g)(7). EPA interprets that provision as limited to *visibility-impairing* air pollutants. 70 Fed. Reg. 39160 (2005), codified at 40 CFR pt. 51, App. Y, §II.A.3.

Although these limitations are nowhere to be found in the Act-wide definition, in each instance EPA has concluded—as it has in the PSD and Title V context—that the statute is not using "air pollutant" in *Massachusetts*' broad sense to mean any airborne substance whatsoever.

*Massachusetts* did not invalidate all these longstanding constructions. That case did not hold that EPA must always regulate greenhouse gases as an "air pollutant" everywhere that term appears in the statute, but only that EPA must "ground its reasons for action *or inaction* in the statute," 549 U. S., at 535 (emphasis added), rather than on "reasoning divorced from the statutory text," *id.,* at 532. EPA's inaction with regard to Title II was not sufficiently grounded in the statute, the Court said, in part

because nothing in the Act suggested that regulating greenhouse gases under that Title would conflict with the statutory design. Title II would not compel EPA to regulate in any way that would be "extreme," "counterintuitive," or contrary to "'common sense.'" *Id.,* at 531. At most, it would require EPA to take the modest step of adding greenhouse-gas standards to the roster of new-motor-vehicle emission regulations. *Ibid.*

*Massachusetts* does not strip EPA of authority to exclude greenhouse gases from the class of regulable air pollutants under other parts of the Act where their inclusion would be inconsistent with the statutory scheme. The Act-wide definition to which the Court gave a "sweeping" and "capacious" interpretation, *id.,* at 528, 532, is not a command to regulate, but a description of the universe of substances EPA may *consider* regulating under the Act's operative provisions. *Massachusetts* does not foreclose the Agency's use of statutory context to infer that certain of the Act's provisions use "air pollutant" to denote not every conceivable airborne substance, but only those that may sensibly be encompassed within the particular regulatory program. As certain *amici* felicitously put it, while *Massachusetts* "rejected EPA's categorical contention that greenhouse gases *could not* be 'air pollutants' for any purposes of the Act," it did not "embrace EPA's current, equally categorical position that greenhouse gases *must* be air pollutants for all purposes" regardless of the statutory context. Brief for Administrative Law Professors et al. as *Amici Curiae* 17.[5]

––––––––––

[5] Our decision in *American Elec. Power Co.* v. *Connecticut*, 564 U. S. ___ (2011), does not suggest otherwise. We there held that the Act's authorization for EPA to establish performance standards for power-plant greenhouse-gas emissions displaced any federal-common-law right that might otherwise have existed to seek abatement of those emissions. *Id.,* at ___ (slip op., at 10). The authorization to which we referred was that given in the NSPS program of §7411, a part of the Act

To be sure, Congress's profligate use of "air pollutant" where what is meant is obviously narrower than the Act-wide definition is not conducive to clarity. One ordinarily assumes "'that identical words used in different parts of the same act are intended to have the same meaning.'" *Environmental Defense* v. *Duke Energy Corp.*, 549 U. S. 561, 574 (2007). In this respect (as in countless others), the Act is far from a *chef d'oeuvre* of legislative draftsmanship. But we, and EPA, must do our best, bearing in mind the "'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 133 (2000). As we reiterated the same day we decided *Massachusetts*, the presumption of consistent usage "'readily yields'" to context, and a statutory term—even one defined in the statute—"may take on distinct characters from association with distinct statutory objects calling for different implementation strategies." *Duke Energy*, *supra*, at 574.

We need not, and do not, pass on the validity of all the limiting constructions EPA has given the term "air pollutant" throughout the Act. We merely observe that taken together, they belie EPA's rigid insistence that when interpreting the PSD and Title V permitting requirements it is bound by the Act-wide definition's inclusion of greenhouse gases, no matter how incompatible that inclusion is with those programs' regulatory structure.

In sum, there is no insuperable textual barrier to EPA's interpreting "any air pollutant" in the permitting triggers of PSD and Title V to encompass only pollutants emitted in quantities that enable them to be sensibly regulated at the statutory thresholds, and to exclude those atypical

_____

not at issue here and one that no party in *American Electric Power* argued was ill suited to accommodating greenhouse gases.

pollutants that, like greenhouse gases, are emitted in such vast quantities that their inclusion would radically transform those programs and render them unworkable as written.[6]

2

Having determined that EPA was mistaken in thinking the Act *compelled* a greenhouse-gas-inclusive interpretation of the PSD and Title V triggers, we next consider the Agency's alternative position that its interpretation was justified as an exercise of its "discretion" to adopt "a reasonable construction of the statute." Tailoring Rule 31517. We conclude that EPA's interpretation is not permissible.

Even under *Chevron*'s deferential framework, agencies must operate "within the bounds of reasonable interpretation." *Arlington*, 569 U. S., at ___ (slip op., at 5). And reasonable statutory interpretation must account for both "the specific context in which . . . language is used" and "the broader context of the statute as a whole." *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341 (1997). A statutory

―――――――――

[6] During the course of this litigation, several possible limiting constructions for the PSD trigger have been proposed. Judge Kavanaugh argued below that it would be plausible for EPA to read "any air pollutant" in the PSD context as limited to the six NAAQS pollutants. See *Coalition for Responsible Regulation, Inc.* v. *EPA*, No. 09–1322 etc. (CADC, Dec. 20, 2012), App. 171–180, 2012 WL 6621785, *15–*18 (opinion dissenting from denial of rehearing en banc). Some petitioners make a slightly different argument: that because PSD permitting is required only for major emitting facilities "in any area to which [the PSD program] applies," §7475(a), the relevant pollutants are only those NAAQS pollutants for which the area in question is designated attainment or unclassifiable. That approach would bring EPA's interpretation of the PSD trigger in line with its longstanding interpretation of the permitting requirements for nonattainment areas. Others maintain that "any air pollutant" in the PSD provision should be limited to air pollutants with localized effects on air quality. We do not foreclose EPA or the courts from considering those constructions in the future, but we need not do so today.

"provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988). Thus, an agency interpretation that is "inconsisten[t] with the design and structure of the statute as a whole," *University of Tex. Southwestern Medical Center* v. *Nassar*, 570 U. S. ___, ___ (2013) (slip op., at 13), does not merit deference.

EPA itself has repeatedly acknowledged that applying the PSD and Title V permitting requirements to greenhouse gases would be inconsistent with—in fact, would overthrow—the Act's structure and design. In the Tailoring Rule, EPA described the calamitous consequences of interpreting the Act in that way. Under the PSD program, annual permit applications would jump from about 800 to nearly 82,000; annual administrative costs would swell from $12 million to over $1.5 billion; and decade-long delays in issuing permits would become common, causing construction projects to grind to a halt nationwide. Tailoring Rule 31557. The picture under Title V was equally bleak: The number of sources required to have permits would jump from fewer than 15,000 to about 6.1 million; annual administrative costs would balloon from $62 million to $21 billion; and collectively the newly covered sources would face permitting costs of $147 billion. *Id.,* at 31562–31563. Moreover, "the great majority of additional sources brought into the PSD and title V programs would be small sources that Congress did not expect would need to undergo permitting." *Id.,* at 31533. EPA stated that these results would be so "contrary to congressional intent," and would so "severely undermine what Congress sought to accomplish," that they necessitated as much as a 1,000-fold increase in the permitting thresholds set forth in the statute. *Id.,* at 31554, 31562.

Like EPA, we think it beyond reasonable debate that requiring permits for sources based solely on their emission of greenhouse gases at the 100- and 250-tons-per-year levels set forth in the statute would be "incompatible" with "the substance of Congress' regulatory scheme." *Brown & Williamson*, 529 U. S., at 156. A brief review of the relevant statutory provisions leaves no doubt that the PSD program and Title V are designed to apply to, and cannot rationally be extended beyond, a relative handful of large sources capable of shouldering heavy substantive and procedural burdens.

Start with the PSD program, which imposes numerous and costly requirements on those sources that are required to apply for permits. Among other things, the applicant must make available a detailed scientific analysis of the source's potential pollution-related impacts, demonstrate that the source will not contribute to the violation of any applicable pollution standard, and identify and use the "best available control technology" for each regulated pollutant it emits. §7475(a)(3), (4), (6), (e). The permitting authority (the State, usually) also bears its share of the burden: It must grant or deny a permit within a year, during which time it must hold a public hearing on the application. §7475(a)(2), (c). Not surprisingly, EPA acknowledges that PSD review is a "complicated, resource-intensive, time-consuming, and sometimes contentious process" suitable for "hundreds of larger sources," not "tens of thousands of smaller sources." 74 Fed. Reg. 55304, 55321–55322.

Title V contains no comparable substantive requirements but imposes elaborate procedural mandates. It requires the applicant to submit, within a year of becoming subject to Title V, a permit application and a "compliance plan" describing how it will comply with "all applicable requirements" under the Act; to certify its compliance annually; and to submit to "inspection, entry, monitoring,

. . . and reporting requirements." §§7661b(b)–(c), 7661c(a)–(c). The procedural burdens on the permitting authority and EPA are also significant. The permitting authority must hold a public hearing on the application, §7661a(b)(6), and it must forward the application and any proposed permit to EPA and neighboring States and respond in writing to their comments, §7661d(a), (b)(1). If it fails to issue or deny the permit within 18 months, any interested party can sue to require a decision "without additional delay." §§7661a(b)(7), 7661b(c). An interested party also can petition EPA to block issuance of the permit; EPA must grant or deny the petition within 60 days, and its decision may be challenged in federal court. §7661d(b)(2)–(3). As EPA wrote, Title V is "finely crafted for thousands," not millions, of sources. Tailoring Rule 31563.

The fact that EPA's greenhouse-gas-inclusive interpretation of the PSD and Title V triggers would place plainly excessive demands on limited governmental resources is alone a good reason for rejecting it; but that is not the only reason. EPA's interpretation is also unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization. When an agency claims to discover in a long-extant statute an unheralded power to regulate "a significant portion of the American economy," *Brown & Williamson*, 529 U. S., at 159, we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast "economic and political significance." *Id.,* at 160; see also *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 231 (1994); *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 645–646 (1980) (plurality opinion). The power to require permits for the construction and modification of tens of thousands,

and the operation of millions, of small sources nationwide falls comfortably within the class of authorizations that we have been reluctant to read into ambiguous statutory text. Moreover, in EPA's assertion of that authority, we confront a singular situation: an agency laying claim to extravagant statutory power over the national economy while at the same time strenuously asserting that the authority claimed would render the statute "unrecognizable to the Congress that designed" it. Tailoring Rule 31555. Since, as we hold above, the statute does not compel EPA's interpretation, it would be patently unreasonable—not to say outrageous—for EPA to insist on seizing expansive power that it admits the statute is not designed to grant.[7]

3

EPA thought that despite the foregoing problems, it could make its interpretation reasonable by adjusting the levels at which a source's greenhouse-gas emissions would

---

[7]A few additional points bear mentioning. The Solicitor General conjectures that EPA might eventually alter its longstanding interpretation of "potential to emit" in order to reduce the number of sources required to have permits at the statutory thresholds. But neither he nor the Agency has given us any reason to believe that there exists a plausible reading of "potential to emit" that EPA would willingly adopt and that would eliminate the unreasonableness of EPA's interpretation. Nor have we been given any information about the ability of other possible "streamlining" techniques alluded to by EPA—such as "general" or "electronic" permitting—to reduce the administrability problems identified above; and in any event, none of those techniques would address the more fundamental problem of EPA's claiming regulatory authority over millions of small entities that it acknowledges the Act does not seek to regulate. Finally, the Solicitor General suggests that the incompatibility of greenhouse gases with the PSD program and Title V results chiefly from the inclusion of carbon dioxide in the "aggregate pollutant" defined by EPA. We decide these cases on the basis of the pollutant "greenhouse gases" as EPA has defined and regulated it, and we express no view on how our analysis might change were EPA to define it differently.

oblige it to undergo PSD and Title V permitting. Although the Act, in no uncertain terms, requires permits for sources with the potential to emit more than 100 or 250 tons per year of a relevant pollutant, EPA in its Tailoring Rule wrote a new threshold of *100,000* tons per year for greenhouse gases. Since the Court of Appeals thought the statute unambiguously made greenhouse gases capable of triggering PSD and Title V, it held that petitioners lacked Article III standing to challenge the Tailoring Rule because that rule did not injure petitioners but merely relaxed the pre-existing statutory requirements. Because we, however, hold that EPA's greenhouse-gas-inclusive interpretation of the triggers was *not* compelled, and because EPA has essentially admitted that its interpretation would be unreasonable without "tailoring," we consider the validity of the Tailoring Rule.

We conclude that EPA's rewriting of the statutory thresholds was impermissible and therefore could not validate the Agency's interpretation of the triggering provisions. An agency has no power to "tailor" legislation to bureaucratic policy goals by rewriting unambiguous statutory terms. Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always "'give effect to the unambiguously expressed intent of Congress.'" *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 665 (2007) (quoting *Chevron*, 467 U. S., at 843). It is hard to imagine a statutory term less ambiguous than the precise numerical thresholds at which the Act requires PSD and Title V permitting. When EPA replaced those numbers with others of its own choosing, it went well beyond the "bounds of its statutory authority." *Arlington*, 569 U. S., at \_\_\_ (slip op., at 5) (emphasis deleted).

The Solicitor General does not, and cannot, defend the Tailoring Rule as an exercise of EPA's enforcement discretion. The Tailoring Rule is not just an announcement of

EPA's refusal to enforce the statutory permitting require-ments; it purports to *alter* those requirements and to establish with the force of law that otherwise-prohibited conduct will not violate the Act. This alteration of the statutory requirements was crucial to EPA's "tailoring" efforts. Without it, small entities with the potential to emit greenhouse gases in amounts exceeding the statutory thresholds would have remained subject to citizen suits—authorized by the Act—to enjoin their construction, modi-fication, or operation and to impose civil penalties of up to $37,500 per day of violation. §§7413(b), 7604(a), (f)(4); 40 CFR §19.4. EPA itself has recently affirmed that the "independent enforcement authority" furnished by the citizen-suit provision cannot be displaced by a permitting authority's decision not to pursue enforcement. 78 Fed. Reg. 12477, 12486–12487 (2013). The Solicitor General is therefore quite right to acknowledge that the availability of citizen suits made it necessary for EPA, in seeking to mitigate the unreasonableness of its greenhouse-gas-inclusive interpretation, to go beyond merely exercising its enforcement discretion. See Tr. of Oral Arg. 87–88.

For similar reasons, *Morton* v. *Ruiz*, 415 U. S. 199 (1974)—to which the Solicitor General points as the best case supporting the Tailoring Rule, see Tr. of Oral Arg. 71, 80–81—is irrelevant. In *Ruiz*, Congress had appropriated funds for the Bureau of Indian Affairs to spend on provid-ing assistance to "'Indians throughout the United States'" and had not "impose[d] any geographical limitation on the availability of general assistance benefits." *Id.,* at 206–207, and n. 7. Although we held the Bureau could not deny benefits to off-reservation Indians because it had not published its eligibility criteria, we stated in dictum that the Bureau could, if it followed proper administrative procedures, "create reasonable classifications and eligibil-ity requirements in order to allocate the limited funds available." *Id.,* at 230–231. That dictum stands only for

the unremarkable proposition that an agency may adopt policies to prioritize its expenditures *within the bounds established by Congress*. See also *Lincoln* v. *Vigil*, 508 U. S. 182, 192–193 (1993). Nothing in *Ruiz* remotely authorizes an agency to modify unambiguous requirements imposed by a federal statute. An agency confronting resource constraints may change its own conduct, but it cannot change the law.

Were we to recognize the authority claimed by EPA in the Tailoring Rule, we would deal a severe blow to the Constitution's separation of powers. Under our system of government, Congress makes laws and the President, acting at times through agencies like EPA, "faithfully execute[s]" them. U. S. Const., Art. II, §3; see *Medellín* v. *Texas*, 552 U. S. 491, 526–527 (2008). The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms that turn out not to work in practice. See, *e.g., Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 462 (2002) (agency lacked authority "to develop new guidelines or to assign liability in a manner inconsistent with" an "unambiguous statute").

In the Tailoring Rule, EPA asserts newfound authority to regulate millions of small sources—including retail stores, offices, apartment buildings, shopping centers, schools, and churches—and to decide, on an ongoing basis and without regard for the thresholds prescribed by Congress, how many of those sources to regulate. We are not willing to stand on the dock and wave goodbye as EPA embarks on this multiyear voyage of discovery. We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate. EPA therefore lacked authority to "tailor" the Act's unambiguous numerical

thresholds to accommodate its greenhouse-gas-inclusive interpretation of the permitting triggers. Instead, the need to rewrite clear provisions of the statute should have alerted EPA that it had taken a wrong interpretive turn. Agencies are not free to "adopt . . . unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." App. 175, 2012 WL 6621785, *16 (Kavanaugh, J., dissenting from denial of rehearing en banc). Because the Tailoring Rule cannot save EPA's interpretation of the triggers, that interpretation was impermissible under *Chevron*.[8]

## B. BACT for "Anyway" Sources

For the reasons we have given, EPA overstepped its statutory authority when it decided that a source could

---

[8] JUSTICE BREYER argues, *post,* at 10 (opinion concurring in part and dissenting in part), that when the statutory permitting thresholds of 100 or 250 tons per year do not provide a "sensible regulatory line," EPA is entitled to "read an unwritten exception" into "the particular number used by the statute"—by which he apparently means that the Agency is entitled to substitute a dramatically higher number, such as 100,000. We are aware of no principle of administrative law that would allow an agency to rewrite such a clear statutory term, and we shudder to contemplate the effect that such a principle would have on democratic governance.

JUSTICE BREYER, however, claims to perceive no difference between (a) reading the statute to exclude greenhouse gases from the term "any air pollutant" in the permitting triggers, and (b) reading the statute to exclude sources emitting less than 100,000 tons per year from the statutory phrase "any . . . source with the potential to emit two hundred and fifty tons per year or more." See *post,* at 7. The two could scarcely be further apart. As we have explained (and as EPA agrees), statutory context makes plain that the Act's operative provisions use "air pollutant" to denote less than the full range of pollutants covered by the Act-wide definition. See Part II–A–1, *supra.* It is therefore incumbent on EPA to specify the pollutants encompassed by that term in the context of a particular program, and to do so reasonably in light of that program's overall regulatory scheme. But there is no ambiguity whatsoever in the specific, numerical permitting thresholds, and thus no room for EPA to exercise discretion in selecting a different threshold.

become subject to PSD or Title V permitting by reason of its greenhouse-gas emissions. But what about "anyway" sources, those that would need permits based on their emissions of more conventional pollutants (such as particulate matter)? We now consider whether EPA reasonably interpreted the Act to require those sources to comply with "best available control technology" emission standards for greenhouse gases.

1

To obtain a PSD permit, a source must be "subject to the best available control technology" for "each pollutant subject to regulation under [the Act]" that it emits. §7475(a)(4). The Act defines BACT as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation" that is "achievable . . . through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques." §7479(3). BACT is determined "on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs." *Ibid.*

Some petitioners urge us to hold that EPA may never require BACT for greenhouse gases—even when a source must undergo PSD review based on its emissions of conventional pollutants—because BACT is fundamentally unsuited to greenhouse-gas regulation. BACT, they say, has traditionally been about end-of-stack controls "such as catalytic converters or particle collectors"; but applying it to greenhouse gases will make it more about regulating energy use, which will enable regulators to control "every aspect of a facility's operation and design," right down to the "light bulbs in the factory cafeteria." Brief for Petitioner Energy-Intensive Manufacturers Working Group on Greenhouse Gas Regulation et al. in No. 12–1254, p. 7; see Joint Reply Brief for Petitioners in No. 12–1248 etc., pp.

14–15 ("BACT for [greenhouse gases] becomes an un-bounded exercise in command-and-control regulation" of everything from "efficient light bulbs" to "basic industrial processes").  But see Brief for Calpine Corp. as *Amicus Curiae* 10 ("[I]n Calpine's experience with 'anyway' sources, the [greenhouse-gas] analysis was only a small part of the overall permitting process").

EPA has published a guidance document that lends some credence to petitioners' fears.  It states that at least initially, compulsory improvements in energy efficiency will be the "foundation" of greenhouse-gas BACT, with more traditional end-of-stack controls either not used or "added as they become more available."  PSD and Title V Permitting Guidance for Greenhouse Gases 29 (Mar. 2011) (hereinafter Guidance); see Peloso & Dobbins, Greenhouse Gas PSD Permitting: The Year in Review, 42 Tex. Env. L. J. 233, 247 (2012) ("Because [other controls] tend to prove infeasible, energy efficiency measures dominate the [greenhouse-gas] BACT controls approved by the states and EPA").  But EPA's guidance also states that BACT analysis should consider options *other than* energy effi-ciency, such as "carbon capture and storage."  Guidance 29, 32, 35–36, 42–43.  EPA argues that carbon capture is reasonably comparable to more traditional, end-of-stack BACT technologies, *id.,* at 32, n. 86, and petitioners do not dispute that.

Moreover, assuming without deciding that BACT may be used to force some improvements in energy efficiency, there are important limitations on BACT that may work to mitigate petitioners' concerns about "unbounded" regu-latory authority.  For one, BACT is based on "control technology" for the applicant's "proposed facility," §7475(a)(4); therefore, it has long been held that BACT cannot be used to order a fundamental redesign of the facility.  See, *e.g., Sierra Club* v. *EPA*, 499 F. 3d 653, 654–655 (CA7 2007); *In re Pennsauken Cty., N. J., Resource*

*Recovery Facility*, 2 E. A. D. 667, 673 (EAB 1988). For another, EPA has long interpreted BACT as required only for pollutants that the source itself emits, see 44 Fed. Reg. 51947 (1979); accordingly, EPA acknowledges that BACT may not be used to require "reductions in a facility's demand for energy from the electric grid." Guidance 24. Finally, EPA's guidance suggests that BACT should not require every conceivable change that could result in minor improvements in energy efficiency, such as the aforementioned light bulbs. *Id.,* at 31. The guidance explains that permitting authorities should instead consider whether a proposed regulatory burden outweighs any reduction in emissions to be achieved, and should concentrate on the facility's equipment that uses the largest amounts of energy. *Ibid.*

2

The question before us is whether EPA's decision to require BACT for greenhouse gases emitted by sources otherwise subject to PSD review is, as a general matter, a permissible interpretation of the statute under *Chevron.* We conclude that it is.

The text of the BACT provision is far less open-ended than the text of the PSD and Title V permitting triggers. It states that BACT is required "for each pollutant subject to regulation under this chapter" (*i.e.,* the entire Act), §7475(a)(4), a phrase that—as the D. C. Circuit wrote 35 years ago—"would not seem readily susceptible [of] misinterpretation." *Alabama Power Co.* v. *Costle*, 636 F. 2d 323, 404 (1979). Whereas the dubious breadth of "any air pollutant" in the permitting triggers suggests a role for agency judgment in identifying the subset of pollutants covered by the particular regulatory program at issue, the more specific phrasing of the BACT provision suggests that the necessary judgment has already been made by Congress. The wider statutory context likewise does not

suggest that the BACT provision can bear a narrowing construction: There is no indication that the Act elsewhere uses, or that EPA has interpreted, "each pollutant subject to regulation under this chapter" to mean anything other than what it says.

Even if the text were not clear, applying BACT to greenhouse gases is not so disastrously unworkable, and need not result in such a dramatic expansion of agency authority, as to convince us that EPA's interpretation is unreasonable. We are not talking about extending EPA jurisdiction over millions of previously unregulated entities, but about moderately increasing the demands EPA (or a state permitting authority) can make of entities already subject to its regulation. And it is not yet clear that EPA's demands will be of a significantly different character from those traditionally associated with PSD review. In short, the record before us does not establish that the BACT provision as written is incapable of being sensibly applied to greenhouse gases.

We acknowledge the potential for greenhouse-gas BACT to lead to an unreasonable and unanticipated degree of regulation, and our decision should not be taken as an endorsement of all aspects of EPA's current approach, nor as a free rein for any future regulatory application of BACT in this distinct context. Our narrow holding is that nothing in the statute categorically prohibits EPA from interpreting the BACT provision to apply to greenhouse gases emitted by "anyway" sources.

However, EPA may require an "anyway" source to comply with greenhouse-gas BACT only if the source emits more than a *de minimis* amount of greenhouse gases. As noted above, the Tailoring Rule applies BACT only if a source emits greenhouse gases in excess of 75,000 tons per year $CO_2$e, but the Rule makes clear that EPA did not arrive at that number by identifying the *de minimis* level. See nn. 1, 3, *supra*. EPA may establish an appropriate *de*

*minimis* threshold below which BACT is not required for a source's greenhouse-gas emissions. We do not hold that 75,000 tons per year $CO_2e$ necessarily exceeds a true *de minimis* level, only that EPA must justify its selection on proper grounds. Cf. *Alabama Power*, *supra,* at 405.[9]

\*    \*    \*

To sum up: We hold that EPA exceeded its statutory authority when it interpreted the Clean Air Act to require PSD and Title V permitting for stationary sources based on their greenhouse-gas emissions. Specifically, the Agency may not treat greenhouse gases as a pollutant for purposes of defining a "major emitting facility" (or a "modification" thereof) in the PSD context or a "major source" in the Title V context. To the extent its regulations purport to do so, they are invalid. EPA may, however, continue to treat greenhouse gases as a "pollutant subject to regulation under this chapter" for purposes of requiring BACT for "anyway" sources. The judgment of the Court of Appeals is affirmed in part and reversed in part.

*It is so ordered.*

---

[9] JUSTICE ALITO argues that BACT is "fundamentally incompatible" with greenhouse gases for two reasons. *Post,* at 4 (opinion concurring in part and dissenting in part). First, BACT requires consideration of "ambient air quality at the proposed site and in areas which may be affected by emissions from [the proposed] facility for each pollutant subject to regulation under this chapter," §7475(e)(1); see also §7475(e)(3)(B); and it is not obvious how that requirement should apply, or even whether it can apply, to greenhouse gases. *Post*, at 4–5. But the possibility that that requirement may be inoperative as to greenhouse gases does not convince us that they must be categorically excluded from BACT even though they are indisputably a "pollutant subject to regulation." Second, JUSTICE ALITO argues that EPA's guidance on how to implement greenhouse-gas BACT is a recipe for "arbitrary and inconsistent decisionmaking." *Post,* at 8. But we are not reviewing EPA's guidance in these cases, and we cannot say that it is impossible for EPA and state permitting authorities to devise rational ways of complying with the statute's directive to determine BACT for greenhouse gases "on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs." §7479(3).

# SUPREME COURT OF THE UNITED STATES

Nos. 12–1146, 12–1248, 12–1254, 12–1268, 12–1269, and 12–1272

UTILITY AIR REGULATORY GROUP,
PETITIONER
12–1146          *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


AMERICAN CHEMISTRY COUNCIL, ET AL.,
PETITIONERS
12–1248          *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


ENERGY-INTENSIVE MANUFACTURERS WORKING
GROUP ON GREENHOUSE GAS REGULATION,
ET AL., PETITIONERS
12–1254          *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


SOUTHEASTERN LEGAL FOUNDATION, INC.,
ET AL., PETITIONERS
12–1268          *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


TEXAS, ET AL., PETITIONERS
12–1269          *v.*
ENVIRONMENTAL PROTECTION AGENCY,
ET AL.; AND


CHAMBER OF COMMERCE OF THE UNITED
STATES, ET AL., PETITIONERS
12–1272          *v.*

Opinion of BREYER, J.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.;

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 23, 2014]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, concurring in part and dissenting in part.

In *Massachusetts* v. *EPA*, 549 U. S. 497 (2007), we held that greenhouse gases fall within the Clean Air Act's general definition of the term "air pollutant," 42 U. S. C. §7602(g). 549 U. S., at 528–529. We also held, consequently, that the Environmental Protection Agency is empowered and required by Title II of the Act to regulate greenhouse gas emissions from mobile sources (such as cars and trucks) if it decides that greenhouse gases "contribute to . . . air pollution which may reasonably be anticipated to endanger public health or welfare," §7521(a)(1). 549 U. S., at 532–533. The EPA determined that greenhouse gases endanger human health and welfare, 74 Fed. Reg. 66496 (2009) (Endangerment Finding), and so it issued regulations for mobile emissions, 75 Fed. Reg. 25324 (2010) (Tailpipe Rule).

These cases take as a given our decision in *Massachusetts* that the Act's *general definition* of "air pollutant" includes greenhouse gases. One of the questions posed by these cases is whether those gases fall within the scope of the phrase "any air pollutant" as that phrase is used in the more specific provisions of the Act here at issue. The Court's answer is "no." *Ante,* at 10–24. I disagree.

The Clean Air Act provisions at issue here are Title I's Prevention of Significant Deterioration (PSD) program, §7470 *et seq.*, and Title V's permitting regime, §7661 *et seq.* By contrast to Title II, Titles I and V apply to stationary sources, such as power plants and factories. Un-

der the PSD program, "major emitting facilities" constructed in the United States must meet certain requirements, including obtaining a permit that imposes emissions limitations, §7475(a)(1), and using "the best available control technology for each pollutant subject to regulation under [the Act] emitted from" the facility, §7475(a)(4). Title V requires each "major source" to obtain an operating permit. §7661a(a).

These cases concern the definitions of "major emitting facility" and "major source," each of which is defined to mean any stationary source that emits more than a threshold quantity of "any air pollutant." See §7479(1) ("major emitting facility"); §§7602(j), 7661(2)(B) ("major source"). To simplify the exposition, I will refer only to the PSD program and its definition of "major emitting facility"; a parallel analysis applies to Title V.

As it is used in the PSD provisions,

> "[t]he term 'major emitting facility' means any of [a list of specific categories of] stationary sources of air pollutants which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant . . . . Such term also includes any other source with the potential to emit two hundred and fifty tons per year or more of any air pollutant." §7479(1).

To simplify further, I will ignore the reference to specific types of source that emit at least 100 tons per year (tpy) of any air pollutant. In effect, we are dealing with a statute that says that the PSD program's regulatory requirements must be applied to

> "any stationary source that has the potential to emit two hundred fifty tons per year or more of any air pollutant."

The interpretive difficulty in these cases arises out of the definition's use of the phrase "two hundred fifty tons

per year or more," which I will call the "250 tpy threshold." When applied to greenhouse gases, 250 tpy is far too low a threshold. As the Court explains, tens of thousands of stationary sources emit large quantities of one greenhouse gas, carbon dioxide. See *ante,* at 17–20, and n. 7. To apply the programs at issue here to all those sources would be extremely expensive and burdensome, counter-productive, and perhaps impossible; it would also contra-vene Congress's intent that the programs' coverage be limited to those large sources whose emissions are sub-stantial enough to justify the regulatory burdens. *Ibid.* The EPA recognized as much, and it addressed the prob-lem by issuing a regulation—the Tailoring Rule—that purports to raise the coverage threshold for greenhouse gases from the statutory figure of 250 tpy to 100,000 tpy in order to keep the programs' coverage limited to "a rela-tively small number of large industrial sources." 75 Fed. Reg. 31514, 31555 (2010); see *id.,* at 31523–31524.

The Tailoring Rule solves the practical problems that would have been caused by the 250 tpy threshold. But what are we to do about the statute's language? The statute specifies a definite number—250, not 100,000—and it says that facilities that are covered by that number must meet the program's requirements. The statute says nothing about agency discretion to change that number. What is to be done? How, given the statute's language, can the EPA exempt from regulation sources that emit more than 250 but less than 100,000 tpy of greenhouse gases (and that also do not emit other regulated pollutants at threshold levels)?

The Court answers by (1) pointing out that regulation at the 250 tpy threshold would produce absurd results, (2) refusing to read the statute as compelling such results, and (3) consequently interpreting the phrase "*any* air pollutant" as containing an implicit exception for green-house gases. (Emphasis added.) Put differently, the

Court reads the statute as defining "major emitting facility" to mean "stationary sources that have the potential to emit two hundred fifty tons per year or more of any air pollutant *except for those air pollutants, such as carbon dioxide, with respect to which regulation at that threshold would be impractical or absurd or would sweep in smaller sources that Congress did not mean to cover.*" See *ante,* at 15–16 ("[T]here is no insuperable textual barrier to EPA's interpreting 'any air pollutant' in the permitting triggers of PSD and Title V to encompass only pollutants emitted in quantities that enable them to be sensibly regulated at the statutory thresholds, and to exclude those atypical pollutants that, like greenhouse gases, are emitted in such vast quantities that their inclusion would radically transform those programs and render them unworkable as written").

I agree with the Court that the word "any," when used in a statute, does not normally mean "any in the universe." Cf. *FCC* v. *NextWave Personal Communications Inc.,* 537 U. S. 293, 311 (2003) (BREYER, J., dissenting) ("'Tell all customers that . . .' does not refer to every customer of every business in the world"). Rather, "[g]eneral terms as used on particular occasions often carry with them implied restrictions as to scope," *ibid.*, and so courts must interpret the word "any," like all other words, in context. As Judge Learned Hand pointed out when interpreting another statute many years ago, "[w]e can best reach the meaning here, as always, by recourse to the underlying purpose, and, with that as a guide, by trying to project upon the specific occasion how we think persons, actuated by such a purpose, would have dealt with it, if it had been presented to them at the time." *Borella* v. *Borden Co.,* 145 F. 2d 63, 64 (CA2 1944). The pursuit of that underlying purpose may sometimes require us to "abandon" a "literal interpretation" of a word like "any." *Id.,* at 64–65.

The law has long recognized that terms such as "any" admit of unwritten limitations and exceptions. Legal philosophers like to point out that a statute providing that "'[w]hoever shall willfully take the life of another shall be punished by death'" need not encompass a man who kills in self-defense; nor must an ordinance imposing fines upon those who occupy a public parking spot for more than two hours penalize a driver who is unable to move because of a parade. See Fuller, The Case of the Speluncean Explorers, 62 Harv. L. Rev. 616, 619, 624 (1949); see also *United States* v. *Kirby*, 7 Wall. 482, 485–487 (1869) (holding that a statute forbidding knowing and willful obstruction of the mail contains an implicit exception permitting a local sheriff to arrest a mail carrier). The maxim *cessante ratione legis cessat ipse lex*—where a law's rationale ceases to apply, so does the law itself—is not of recent origin. See, *e.g., Zadvydas* v. *Davis*, 533 U. S. 678, 699 (2001) (citing 1 E. Coke, Institutes \*70b); *Green* v. *Liter*, 8 Cranch 229, 249 (1814) (Story, J.) ("*cessante ratione, cessat ipsa lex*").

I also agree with the Court's point that "a generic reference to air pollutants" in the Clean Air Act need not "encompass every substance falling within the Act-wide definition" that we construed in *Massachusetts*, §7602(g). See *ante,* at 12–13. As the Court notes, the EPA has interpreted the phrase "any air pollutant," which is used several times in the Act, as limited to "air pollutants *for which EPA has promulgated [new source performance standards]*" in the portion of the Act dealing with those standards, as limited to "*visibility-impairing* air pollutants" in the part of the Act concerned with deleterious effects on visibility, and as limited to "pollutants *for which the area is designated nonattainment*" in the part of the Act aimed at regions that fail to attain air quality standards. *Ibid.*

But I do not agree with the Court that the only way to

avoid an absurd or otherwise impermissible result in these cases is to create an atextual greenhouse gas exception to the phrase "any air pollutant." After all, the word "any" makes an earlier appearance in the definitional provision, which defines "major emitting facility" to mean "*any . . . source with the potential to emit two hundred and fifty tons per year or more of any air pollutant*." §7479(1) (emphasis added). As a linguistic matter, one can just as easily read an implicit exception for small-scale greenhouse gas emissions into the phrase "any source" as into the phrase "any air pollutant." And given the purposes of the PSD program and the Act as a whole, as well as the specific roles of the different parts of the statutory definition, finding flexibility in "any source" is far more sensible than the Court's route of finding it in "any air pollutant."

The implicit exception I propose reads almost word for word the same as the Court's, except that the location of the exception has shifted. To repeat, the Court reads the definition of "major emitting facility" as if it referred to "any source with the potential to emit two hundred fifty tons per year or more of any air pollutant *except for those air pollutants, such as carbon dioxide, with respect to which regulation at that threshold would be impractical or absurd or would sweep in smaller sources that Congress did not mean to cover*." I would simply move the implicit exception, which I've italicized, so that it applies to "source" rather than "air pollutant": "any *source* with the potential to emit two hundred fifty tons per year or more of any air pollutant *except for those sources, such as those emitting unmanageably small amounts of greenhouse gases, with respect to which regulation at that threshold would be impractical or absurd or would sweep in smaller sources that Congress did not mean to cover*."

From a legal, administrative, and functional perspective—that is, from a perspective that assumes that Congress was not merely trying to arrange words on paper but

was seeking to achieve a real-world *purpose*—my way of reading the statute is the more sensible one. For one thing, my reading is consistent with the specific purpose underlying the 250 tpy threshold specified by the statute. The purpose of that number was not to prevent the regulation of dangerous air pollutants that cannot be sensibly regulated at that particular threshold, though that is the effect that the Court's reading gives the threshold. Rather, the purpose was to limit the PSD program's obligations to larger sources while exempting the many small sources whose emissions are low enough that imposing burdensome regulatory requirements on them would be senseless.

Thus, the accompanying Senate Report explains that the PSD program "is reasonable and necessary for very large sources, such as new electrical generating plants or new steel mills. But the procedure would prove costly and potentially unreasonable if imposed on construction of storage facilities for a small gasoline jobber or on the construction of a new heating plant at a junior college." S. Rep. No. 95–127, p. 96 (1977). And the principal sponsor of the Clean Air Act amendments at issue here, Senator Edmund Muskie, told the Senate that the program would not cover "houses, dairies, farms, highways, hospitals, schools, grocery stores, and other such sources." 123 Cong. Rec. 18013, 18021 (1977).

The EPA, exercising the legal authority to which it is entitled under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), understood the threshold's purpose in the same light. It explained that Congress's objective was

> "to limit the PSD program to large industrial sources because it was those sources that were the primary cause of the pollution problems in question and because those sources would have the resources to com-

ply with the PSD requirements. Congress's mechanism for limiting PSD was the 100/250 tpy threshold limitations. Focused as it was primarily on NAAQS pollutants [that is, those air pollutants for which the EPA has issued a national ambient air quality standard under Title I of the Act, see *EPA* v. *EME Homer City Generation, L. P.*, 572 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 4)], Congress considered sources that emit NAAQS pollutants in those quantities generally to be the large industrial sources to which it intended PSD to be limited." Tailoring Rule, 75 Fed. Reg. 31555.

The Court similarly acknowledges that "the PSD program and Title V are designed to apply to, and cannot rationally be extended beyond, a relative handful of large sources capable of shouldering heavy substantive and procedural burdens." *Ante,* at 18; see also *Alabama Power Co.* v. *Costle*, 636 F. 2d 323, 353 (CADC 1979) ("Congress's intention was to identify facilities which, due to their size, are financially able to bear the substantial regulatory costs imposed by the PSD provisions and which, as a group, are primarily responsible for emission of the deleterious pollutants that befoul our nation's air").

An implicit source-related exception would serve this statutory purpose while going no further. The implicit exception that the Court reads into the phrase "any air pollutant," by contrast, goes well beyond the limited congressional objective. Nothing in the statutory text, the legislative history, or common sense suggests that Congress, when it imposed the 250 tpy threshold, was trying to undermine its own deliberate decision to use the broad language "any air pollutant" by removing some substances (rather than some facilities) from the PSD program's coverage.

For another thing, a source-related exception serves the flexible nature of the Clean Air Act. We observed in *Mas-*

*sachusetts* that "[w]hile the Congresses that drafted" the Act "might not have appreciated the possibility that burning fossil fuels could lead to global warming, they did understand that without regulatory flexibility, changing circumstances and scientific developments would soon render the Clean Air Act obsolete." 549 U. S., at 532. We recognized that "[t]he broad language of" the Act-wide definition of "air pollutant" "reflects an intentional effort to confer the flexibility necessary to forestall such obsolescence." *Ibid.*

The Court's decision to read greenhouse gases out of the PSD program drains the Act of its flexibility and chips away at our decision in *Massachusetts*. What sense does it make to read the Act as generally granting the EPA the authority to regulate greenhouse gas emissions and then to read it as denying that power with respect to the programs for large stationary sources at issue here? It is anomalous to read the Act to require the EPA to regulate air pollutants that pose previously unforeseen threats to human health and welfare where "250 tons per year" is a sensible regulatory line but not where, by chemical or regulatory happenstance, a higher line must be drawn. And it is anomalous to read an unwritten exception into the more important phrase of the statutory definition ("any air pollutant") when a similar unwritten exception to less important language (the particular number used by the statute) will do just as well. The implicit exception preferred by the Court produces all of these anomalies, while the source-related exception I propose creates none of them.

In addition, the interpretation I propose leaves the EPA with the sort of discretion as to interstitial matters that Congress likely intended it to retain. My interpretation gives the EPA nothing more than the authority to *exempt* sources from regulation insofar as the Agency reasonably determines that applying the PSD program to them would

expand the program so much as to contravene Congress's intent. That sort of decision, which involves the Agency's technical expertise and administrative experience, is the kind of decision that Congress typically leaves to the agencies to make. Cf. *Barnhart* v. *Walton*, 535 U. S. 212, 222 (2002) (enumerating factors that we take to indicate that Congress intends the agency to exercise the discretion provided by *Chevron*). To read the Act to grant that discretion here is to read it as furthering Congress's (and the public's) interest in more effective, less wasteful regulation.

Last, but by no means least, a source-related exception advances the Act's overall purpose. That broad purpose, as set forth at the beginning of the statute, is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." §7401(b)(1); see also §7470(1) (A purpose of the PSD program in particular is "to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate[d] to occur from air pollution"); §7602(h) ("All language [in the Act] referring to effects on welfare includes . . . effects on . . . weather . . . and climate"). The expert agency charged with administering the Act has determined in its Endangerment Finding that greenhouse gases endanger human health and welfare, and so sensible regulation of industrial emissions of those pollutants is at the core of the purpose behind the Act. The broad "no greenhouse gases" exception that the Court reads into the statute unnecessarily undercuts that purpose, while my narrow source-related exception would leave the Agency with the tools it needs to further it.

\*　　\*　　\*

I agree with the Court's holding that stationary sources

that are subject to the PSD program because they emit other (non-greenhouse-gas) pollutants in quantities above the statutory threshold—those facilities that the Court refers to as "anyway" sources—must meet the "best available control technology" requirement of §7475(a)(4) with respect to greenhouse gas emissions. I therefore join Part II–B–2 of the Court's opinion. But as for the Court's holding that the EPA cannot interpret the language at issue here to cover facilities that emit more than 100,000 tpy of greenhouse gases by virtue of those emissions, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

Nos. 12–1146, 12–1248, 12–1254, 12–1268, 12–1269, and 12–1272

UTILITY AIR REGULATORY GROUP,
PETITIONER
12–1146            *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


AMERICAN CHEMISTRY COUNCIL, ET AL.,
PETITIONERS
12–1248            *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


ENERGY-INTENSIVE MANUFACTURERS WORKING
GROUP ON GREENHOUSE GAS REGULATION,
ET AL., PETITIONERS
12–1254            *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


SOUTHEASTERN LEGAL FOUNDATION, INC.,
ET AL., PETITIONERS
12–1268            *v.*
ENVIRONMENTAL PROTECTION AGENCY, ET AL.;


TEXAS, ET AL., PETITIONERS
12–1269            *v.*
ENVIRONMENTAL PROTECTION AGENCY,
ET AL.; AND


CHAMBER OF COMMERCE OF THE UNITED
STATES, ET AL., PETITIONERS
12–1272            *v.*

ENVIRONMENTAL PROTECTION AGENCY, ET AL.;

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 23, 2014]

JUSTICE ALITO, with whom JUSTICE THOMAS joins,
concurring in part and dissenting in part.

In *Massachusetts* v. *EPA*, 549 U. S. 497 (2007), this
Court considered whether greenhouse gases fall within the
Clean Air Act's general definition of an air "pollutant."
*Id.,* at 528–529. The Environmental Protection Agency
cautioned us that "key provisions of the [Act] cannot co-
gently be applied to [greenhouse gas] emissions," Brief for
Federal Respondent in *Massachusetts* v. *EPA*, O. T. 2006,
No. 05–1120, p. 22, but the Court brushed the warning
aside and had "little trouble" concluding that the Act's
"sweeping definition" of a pollutant encompasses green-
house gases. 549 U. S., at 528–529. I believed *Massachu-
setts* v. *EPA* was wrongly decided at the time, and these
cases further expose the flaws with that decision.

I

As the present cases now show, trying to fit greenhouse
gases into "key provisions" of the Clean Air Act involves
more than a "little trouble." These cases concern the
provisions of the Act relating to the "Prevention of Signifi-
cant Deterioration" (PSD), 42 U. S. C. §§7470–7492, as
well as Title V of the Act, §7661. And in order to make
those provisions apply to greenhouse gases in a way that
does not produce absurd results, the EPA effectively
amended the Act. The Act contains specific emissions
thresholds that trigger PSD and Title V coverage, but the
EPA crossed out the figures enacted by Congress and
substituted figures of its own.

I agree with the Court that the EPA is neither required
nor permitted to take this extraordinary step, and I there-

fore join Parts I and II–A of the Court's opinion.

## II

I do not agree, however, with the Court's conclusion that what it terms "anyway sources," *i.e.*, sources that are subject to PSD and Title V permitting as the result of the emission of conventional pollutants, must install "best available control technology" (BACT) for greenhouse gases. As is the case with the PSD and Title V thresholds, trying to fit greenhouse gases into the BACT analysis badly distorts the scheme that Congress adopted.

The Court gives two main reasons for concluding that BACT applies to "anyway" sources, one based on text and one based on practical considerations. Neither is convincing.

### A

With respect to the text, it is curious that the Court, having departed from a literal interpretation of the term "pollutant" in Part II–A, turns on its heels and adopts a literal interpretation in Part II–B. The coverage thresholds at issue in Part II–A apply to any "pollutant." The Act's general definition of this term is broad, and in *Massachusetts* v. *EPA*, *supra*, the Court held that this definition covers greenhouse gases. The Court does not disturb that holding, but it nevertheless concludes that, as used in the provision triggering PSD coverage, the term "pollutant" actually means "pollutant, other than a greenhouse gas."

In Part II–B, the relevant statutory provision says that BACT must be installed for any "pollutant subject to regulation under [the Act]." §7475(a)(4). If the term "pollutant" means "pollutant, other than a greenhouse gas," as the Court effectively concludes in Part II–A, the term "pollutant subject to regulation under [the Act]" in §7475(a)(4) should mean "pollutant, other than a green-

house gas, subject to regulation under [the Act], and that is subject to regulation under [the Act]." The Court's literalism is selective, and it results in a strange and disjointed regulatory scheme.

Under the Court's interpretation, a source can emit an unlimited quantity of greenhouse gases without triggering the need for a PSD permit. Why might Congress have wanted to allow this? The most likely explanation is that the PSD permitting process is simply not suited for use in regulating this particular pollutant. And if that is so, it makes little sense to require the installation of BACT for greenhouse gases in those instances in which a source happens to be required to obtain a permit due to the emission of a qualifying quantity of some other pollutant that is regulated under the Act.

### B

The Court's second reason for holding that BACT applies to "anyway" sources is its belief that this can be done without disastrous consequences. Only time will tell whether this hope is well founded, but it seems clear that BACT analysis is fundamentally incompatible with the regulation of greenhouse-gas emissions for at least two important reasons.

### 1

First, BACT looks to the effects of covered pollutants in the area in which a source is located. The PSD program is implemented through "emission limitations and such other measures" as are "necessary . . . to prevent significant deterioration of air quality *in each region.*" §7471 (emphasis added). The Clean Air Act provides that BACT must be identified "on a case-by-case basis," §7479(3), and this necessarily means that local conditions must be taken into account. For this reason, the Act instructs the EPA to issue regulations requiring an analysis of "the ambient air

quality . . . *at the site of the proposed major emitting facility and in the area potentially affected* by the emissions from such facility for each pollutant regulated under [the Act]." §7475(e)(3)(B) (emphasis added). The Act also requires a public hearing on "the air quality *at the proposed site and in areas which may be affected* by emissions from such facility for each pollutant subject to regulation under [the Act] which will be emitted from such facility." §§7475(a)(2), (e)(1) (emphasis added). Accordingly, if BACT is required for greenhouse gases, the Act demands that the impact of these gases in the area surrounding a site must be monitored, explored at a public hearing, and considered as part of the permitting process. The effects of greenhouse gases, however, are global, not local. See PSD and Title V Permitting Guidance for Greenhouse Gases 41–42 (Mar. 2011) (hereinafter Guidance). As a result, the EPA has declared that PSD permit applicants and permitting officials may disregard these provisions of the Act. 75 Fed. Reg. 31520 (2010).

2

Second, as part of the case-by-case analysis required by BACT, a permitting authority must balance the environmental benefit expected to result from the installation of an available control measure against adverse consequences that may result, including any negative impact on the environment, energy conservation, and the economy. And the EPA itself has admitted that this cannot be done on a case-by-case basis with respect to greenhouse gases.

The Clean Air Act makes it clear that BACT must be determined on a "case-by-case basis, taking into account energy, environmental, and economic impacts and other costs." §7479(3). To implement this directive, the EPA adopted a five-step framework for making a BACT determination. See New Source Review Workshop Manual: Prevention of Significant Deterioration and Nonattain-

ment Area Permitting (Oct. 1990).[1]  Under the fourth step of this analysis, potentially applicable and feasible control technologies that are candidates for selection as BACT for a particular source are eliminated from consideration based on their "collateral impacts," such as any adverse environmental effects or adverse effects on energy consumption or the economy.

More recently, the EPA provided guidance to permitting authorities regarding the treatment of greenhouse-gas emissions under this framework, and the EPA's guidance demonstrates the insuperable problem that results when an attempt is made to apply this framework to greenhouse gas emissions.  As noted above, at step 4 of the framework, a permitting authority must balance the positive effect likely to result from requiring a particular source to install a particular technology against a variety of negative effects that are likely to occur if that step is taken.  But in the case of greenhouse gases, how can a permitting authority make this individualized, source-specific determination?

The EPA instructs permitting authorities to take into

_____

[1] The EPA describes these steps as follows:

(1) The applicant must identify all available control options that are potentially applicable by consulting EPA's BACT clearinghouse along with other reliable sources.

(2) The technical feasibility of the control options identified in step 1 are eliminated based on technical infeasibility.

(3) The control technologies are ranked based on control effectiveness, by considering: the percentage of the pollutant removed; expected emission rate for each new source review (NSR) pollutant; expected emission reduction for each regulated NSR pollutant; and output based emissions limit.

(4) Control technologies are eliminated based on collateral impacts, such as: energy impacts; other environmental impacts; solid or hazardous waste; water discharge from control device; emissions of air toxics and other non-NSR regulated pollutants; and economic impacts.

(5) The most effective control option not eliminated in step 4 is proposed as BACT for the pollutant and emission unit under review.

consideration all the adverse effects that the EPA has found to result from *the overall increase* in greenhouse gases in the atmosphere. These include an increased risk of dangerous heat waves, hurricanes, floods, wildfires, and drought, as well as risks to agriculture, forestry, and water resources. Guidance 40–41. But the EPA admits that it is simply not possible for a permitting authority to calculate in any meaningful way the degree to which any potential reduction in greenhouse gas emissions from any individual source might reduce these risks. And without making such a calculation in even a very rough way, a permitting authority cannot do what the Clean Air Act and the EPA's framework demand—compare the benefits of some specified reduction in the emission of greenhouse gases from a particular source with any adverse environmental or economic effects that might result from mandating such a reduction.

Suppose, for example, that a permitting authority must decide whether to mandate a change that both decreases a source's emission of greenhouse gases and increases its emission of a conventional pollutant that has a negative effect on public health. How should a permitting authority decide whether to require this change? Here is the EPA's advice:

> "[W]hen considering the trade-offs between the environmental impacts of a particular level of GHG [greenhouse gas] reduction and a collateral increase in another regulated NSR pollutant,[2] rather than attempting to determine or characterize specific environmental impacts from GHGs emitted at particular locations, EPA recommends that permitting authorities focus on the amount of GHG emission reductions

---

[2] "New source review pollutants" are those pollutants for which a National Ambient Air Quality standard has been set and a few others, such as sulphur dioxide. See 40 CFR 51.165(a)(1)(xxxvii) (2013).

that may be gained or lost by employing a particular control strategy and how that compares to the environmental or other impacts resulting from the collateral emissions increase of other regulated NSR pollutants." Guidance 42.

As best I can make out, what this means is that permitting authorities should not even try to assess the net impact on public health. Instead of comparing the positive and negative public health effects of a particular option, permitting authorities are instructed to compare the adverse public health effects of increasing the emissions of the conventional pollutants with the amount of the reduction of the source's emissions of greenhouse gases. But without knowing the positive effects of the latter, this is a meaningless comparison.

The EPA tries to ameliorate this problem by noting that permitting authorities are entitled to "a great deal of discretion," Guidance 41, but without a comprehensible standard, what this will mean is arbitrary and inconsistent decisionmaking. That is not what the Clean Air Act contemplates.[3]

\*   \*   \*

BACT analysis, like the rest of the Clean Air Act, was developed for use in regulating the emission of conventional pollutants and is simply not suited for use with respect to greenhouse gases. I therefore respectfully dissent from Part II–B–2 of the opinion of the Court.

---

[3] While I do not think that BACT applies at all to "anyway sources," if it is to apply, the limitations suggested in Part II–B–1 might lessen the inconsistencies highlighted in Part II of this opinion, and on that understanding I join Part II–B–1.