Justice ALITO, dissenting.
If the Court is going to devise its own legal rules, instead of interpreting those enacted by Congress, it might at least adopt rules that can be applied with a modicum of consistency. Here, however, *1483 the Court makes up a rule that provides no clear guidance and invites arbitrary and inconsistent application.
The text of the Clean Water Act generally requires a permit when a discharge "from" a "point source" (such as a pipe) "add[s]" a pollutant "to" navigable waters (such as the Pacific Ocean). 33 U.S.C. § 1362(12). There are two ways to read this text. A pollutant that reaches the ocean could be understood to have been added "from" a pipe if the pipe originally discharged the pollutant and the pollutant eventually made its way to the ocean by flowing over or under the surface of the ground. Or a pollutant that reaches the ocean could be understood to have come "from" a pipe if the pollutant is discharged from the pipe directly into the ocean.
There is no comprehensible alternative to these two interpretations, but the Court refuses to accept either. Both alternatives, it believes, lead to unacceptable results, and it therefore tries to find a middle way. It holds that a permit is required "when there is a direct discharge from a point source into navigable waters or when there is the functional equivalent of a direct discharge ." Ante , at 1476. This is not a plausible interpretation of the statutory text and, to make matters worse, the Court's test has no clear meaning.
Just what is the "functional equivalent" of a "direct discharge"? The Court provides no real answer. All it will say is that the distance a pollutant travels and the time this trip entails are the most important factors, but at least five other factors may have a bearing on the question, and even this list is not exhaustive. Ante , at 1476 - 1477. Entities like water treatment authorities that need to know whether they must get a permit are left to guess how this nebulous standard will be applied. Regulators are given the discretion, at least in the first instance, to make of this standard what they will. And the lower courts? The Court's advice, in essence, is: "That's your problem. Muddle through as best you can."
I
Petitioner, the County of Maui (County), built the Lahaina Wastewater Reclamation Facility in the 1970s. Excerpts of Record 304. The facility receives sewage and then discharges treated wastewater into wells (essentially long pipes) that extend 200 feet or more below ground level. Id. , at 694-695. Some of this discharge enters an aquifer below the facility. Id. , at 696.
In all the years of its operation, the facility has never had a National Pollution Discharge Elimination System (NPDES) permit for discharges from the wells, a fact that has been well known to both the EPA and the Hawaii Department of Health (HDOH). The EPA helped to finance the construction of the facility with a Clean Water Act grant. Id. , at 141. In 1973, before breaking ground on the facility, the County prepared an environmental impact report and shared it with the EPA and the HDOH. Id. , at 140, 342. The report predicted that effluent injected into groundwater from the wells would "eventually reach the ocean some distance from the shore." Id. , at 342. Both the EPA and the HDOH received and submitted comments on the report without any mention of a need for permitting discharges from the wells. Id. , at 140. Six years later, the HDOH issued an NPDES permit to the facility-but not for the wells. (The permit covered separate discharges to the Honokowai Stream.) Id. , at 141, 223-224. And in a May 1985 NPDES Compliance Monitoring Report, the EPA concluded that the County was operating in compliance with the permit, because all effluent was entering the injection wells-and was thus destined for groundwater rather than for navigable waters or for use in irrigation.
*1484 Id. , at 141, 222. In 1994, HDOH again informed the EPA that "all experts agree that the wastewater does enter the ocean." Id. , at 369. And again-nothing from the federal authorities.
Thus, despite nearly five decades of notice that effluent from the facility would make, or was making, its way via groundwater to the ocean, neither the EPA nor the HDOH required NPDES permitting for the Lahaina wells. App. to Pet. for Cert. 138, 143. Indeed, none of the more than 6,600 underground injection wells in Hawaii currently has an NPDES permit.[1]
In 2012, however, as the Court recounts, respondents filed a citizen suit claiming that the Lahaina facility was violating the Clean Water Act by discharging pollutants into the ocean without a permit. The District Court granted summary judgment against the County on the issue of liability because pollutants "can be directly traced from the injection wells to the ocean." 24 F.Supp.3d 980, 998 (Haw. 2014) (emphasis deleted).
The parties then entered into a conditional settlement
that would take effect if the County were unsuccessful on appeal. Under that agreement, the County must: make good-faith efforts to obtain and comply with an NPDES permit; pay $100,000 in civil penalties; spend $2.5 million on a "supplemental environmental project" in the western part of the island of Maui; and pay nearly $1 million for respondents' attorney's fees and other costs of litigation.[2]
On appeal, the Ninth Circuit affirmed on the ground that pollutants that eventually reached the ocean were "fairly traceable" to the wells. 886 F.3d 737, 749 (2018). We granted review and must now decide whether the Court of Appeals erred in holding that the discharge of effluent from the wells into groundwater requires a permit.
II
The Clean Water Act generally makes it unlawful to "discharge" a "pollutant"[3] without a permit. 33 U.S.C. § 1311(a). The Act defines the "discharge of a pollutant" as "any addition of any pollutant to navigable waters[4] from any point source." § 1362(12). And a "point source" is broadly defined as "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." § 1362(14). The Act includes a non-exhaustive list of conveyances that fall within this *1485 definition, and included on that list are such things as "pipe[s]," "ditch[es]," "channel[s]," and "well[s]." Ibid .
Putting all these statutory terms together, the rule can be stated as follows: A permit is required when a pollutant is "add[ed]" to navigable waters "from" a "point source." In this case, the parties and the EPA agree that most of the elements of this rule are met. Specifically, they agree that: The effluent emitted by the wells is a "pollutant"; this effluent reaches navigable waters (the Pacific Ocean); and the wells are "point source[s]." The disputed question is whether the emission of effluent from those wells qualifies as a "discharge," that is, the addition of a pollutant "from" a point source . § 1362(12) (emphasis added).
There are two possible interpretations of this phrase. The first is that pollutants are added to navigable waters from a point source whenever they originally came from the point source. The second is that pollutants are added to navigable waters only if they were discharged from a point source directly into navigable waters.
Dissatisfied with those options, the Court tries to find a third, but its interpretation is very hard to fit into the statutory text. Under the Court's interpretation, it appears that a pollutant that leaves a point source and heads toward navigable waters via some non-point source (such as by flowing over the ground or by means of groundwater) is "from" the point source for some portion of its journey, but once it has travelled a certain distance or once a certain amount of time has elapsed, it is no longer "from" the point source and is instead "from" a non-point source.
This is an implausible reading of the statute. The Court has many inventive examples of the different meanings that can be conveyed by the simple statement that A comes from B, but one of the Court's examples-the traveler who flies from Europe to Baltimore-illustrates the problem. If we apply the Court's interpretation of § 1362 to this traveler's journey, he would be "from" Europe for the first part of the flight, but at some point he might cease to be "from" Europe and would then be from someplace else, maybe Greenland or geographical coordinates in the middle of the Atlantic. This is a very strange notion, and therefore, I think the statutory text compels us to choose between the two alternatives set out above.
The Court rejects both of these because it thinks they lead to unacceptably extreme results. "Originally from" would impose liability even if pollutants discharged into ground water had to travel 250 miles over the course of 100 years before reaching navigable waters. See ante , at 1470 - 1471. And " 'immediately' " or " 'directly' from," the Court thinks, would mean that a polluter could evade the permit requirement by discharging pollutants from a pipe located just a few feet from navigable waters. Ante , at 1475 - 1476.
To escape these possibilities, the Court devises its own test: A permit is required, the Court holds, "when there is a direct discharge from a point source into navigable waters or when there is the functional equivalent of a direct discharge." Ante , at 1476 (emphasis in original). The Clean Water Act, however, says nothing about "the functional equivalent" of a direct discharge. That is the Court's own concoction, and the Court provides no clear explanation of its meaning.
The term "functional equivalent" may have a quasi-technical ring, but what does it mean? "Equivalent" means "equal" in some respect, and "functional" signifies a relationship to a function. The function of a direct discharge from a point source into navigable waters is to convey the entirety *1486 of the discharge into navigable waters without any delay. Therefore, the "functional equivalent" of a direct discharge of a pollutant into navigable waters would seem to be a discharge that is equal to a direct discharge in these respects.
If that is what the Court meant by "the functional equivalent of a direct discharge," the test would apply at best to only a small set of situations not involving a direct discharge. The Court's example of a pipe that emits pollutants a few feet from the ocean would presumably qualify on de minimis grounds, but if the pipe were moved back any significant distance, the discharge would not be exactly equal to a direct discharge. There would be some lag from the time of the discharge to the time when the pollutant reaches navigable waters; some of the pollutant might not reach that destination; and the pollutant might have changed somewhat in composition by the time it reached the navigable waters.
For these reasons, the Court's reference to "the functional equivalent of a direct discharge," if taken literally, would be of little importance, but the Court's understanding of this concept is very different from the literal meaning of the phrase. As used by the Court, "the functional equivalent of a direct discharge" means a discharge that is sufficiently similar to a direct discharge to warrant a permit in light of the Clean Water Act's "language, structure, and purposes." See ante , at 1477 - 1478. But what, in concrete terms, does this mean? How similar is sufficiently similar?
The Court provides this guidance. It explains that time and distance are the most important factors, ante , at 1476 - 1477, but it does not set any time or distance limits except to observe that a permit is needed where the discharge is a few feet away from navigable waters and that a permit is not required where the discharge is far away and it takes "many years" for the pollutants to complete the journey. Ante , at 1475 - 1477. Beyond this, the Court provides a list (and a non-exhaustive one at that!) of five other factors that may be relevant: "the nature of the material through which the pollutant travels," "the extent to which the pollutant is diluted or chemically changed as it travels," "the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source," "the manner by or area in which the pollutant enters the navigable waters," and "the degree to which the pollution (at that point) has maintained its specific identity." Ante , at 1476 - 1477.
The Court admits that its rule "does not, on its own, clearly explain how to deal with middle instances," ibid ., but that admission does not go far enough. How the rule applies to "middle instances" is anybody's guess. Except in extreme cases, dischargers will be able to argue that the Court's multifactor test does not require a permit. Opponents will be able to make the opposite argument. Regulators will be able to justify whatever result they prefer in a particular case. And judges will be left at sea.
III
A
Instead of concocting our own rule, I would interpret the words of the statute, and in my view, the better of the two possible interpretations is that a permit is required when a pollutant is discharged directly from a point source to navigable waters. This interpretation is consistent with the statutory language and better fits the overall scheme of the Clean Water Act. And properly understood, it does not have the sort of extreme consequences that the Court finds unacceptable.
*1487 Take the Court's example of a pipe that discharges pollutants a short distance from the ocean. Ante , at 1473. This pipe qualifies as a point source. 33 U.S.C. § 1362(14). If its discharge goes directly into another point source and that point source discharges directly into navigable waters, there is a direct discharge into navigable waters, and a permit is needed. See Rapanos v. United States , 547 U.S. 715, 743-744, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (plurality opinion).[5]
That a permit is required in this situation is important because the Clean Water Act's definition of a "point source" is very broad, and as a result, many discharges onto the surface of land are likely to be covered. As noted, "point source[s]" include "ditch[es]" and "channel[s]," as well as "any discernible, confined and discrete conveyance ... from which pollutants ... may be discharged." § 1362(14). Therefore if water discharged on the surface of the land finds or creates a passage leading to navigable waters, a permit may be required if the course that the discharge takes is (1) a "conveyance" that is (2) "discernible" and (3) "confined."
*1488 Those three requirements are rather easily satisfied. When a liquid flows over the surface of land to navigable waters, the surface is a conveyance, i.e. , a "means of carrying or transporting something" from one place to another. Webster's Third New International Dictionary 499 (1971) (Webster's Third); Random House Dictionary of the English Language 320 (1967) (Random House).[6] This conveyance would be "discernible," i.e. , capable of being seen. Webster's Third 644; Random House 409. And it would be "confined," i.e. , held within bounds, see Webster's Third 476; Random House 308, if the topography of the land in question imposes some boundaries on its flow.
If the term "point source" is read in this way, it would have a broad reach and would cover many of the cases that trouble the Court. Moreover-and I find this point particularly important-even if this interpretation fails to capture every case that seems to call out for regulation, that would not mean that these cases would necessarily remain unchecked. The States have the authority to regulate the discharge of pollutants by non-point sources. See 33 U.S.C. §§ 1285(j), 1314(f), 1329(i), 1329(b)(1), (h). They are entrusted with a vital role under the Clean Water Act, and there is no reason to believe that they would tolerate cases of abuse.
The interpretation I have outlined is not only consistent with the statutory language; it is strongly supported by the Clean Water Act's regulatory scheme for at least two reasons. First, it respects Congress' decision to treat point-source pollution differently from non-point-source pollution, including pollution conveyed by groundwater. See 84 Fed. Reg. 16832.[7] The Court itself recognizes this:
"[T]he structure of the statute indicates that, as to groundwater pollution and non[-]point source pollution, Congress intended to leave substantial responsibility and autonomy to the States." Ante , at 1471.
"Over many decades, and with federal encouragement, the States have developed methods of regulating nonpoint source pollution through water quality standards, and otherwise." Ibid .
"The Act envisions EPA's role in managing non[-]point source pollution and groundwater pollution as limited to studying the issue, sharing information with and collecting information from the States, and issuing monetary grants." Ante , at 1471.
Point sources are readily identifiable and therefore more susceptible to uniform nationwide regulation. Non-point source pollution, on the other hand, often presents *1489 more complicated issues that are better suited to individualized local solutions. See Shanty Town Assocs. L. P. v. EPA , 843 F.2d 782, 791 (C.A.4 1988) ("[T]he control of non[-]point source pollution was so dependent on such site-specific factors as topography, soil structure, rainfall, vegetation, and land use that its uniform federal regulation was virtually impossible"); Natural Resources Defense Council v. EPA , 915 F.2d 1314, 1316 (C.A.9 1990) ("The Act focused on point source polluters presumably because they could be identified and regulated more easily than non[-]point source polluters"); Brief for State of West Virginia et al. as Amici Curiae 14-18.
Second, this bright-line rule is consistent with the Act's remedial scheme. The Clean Water Act imposes a regime of strict liability, §§ 1311, 1342, 1344, backed by criminal penalties and steep civil fines, § 1319. Thus, "the consequences to landowners even for inadvertent violations can be crushing." Army Corps of Engineers v. Hawkes Co. , 578 U.S. ----, ----, 136 S.Ct. 1807, 1816, 195 L.Ed.2d 77 (2016) (Kennedy, J., concurring). The Act authorizes as much as $54,833 in fines per day (or more than $20 million per year), 40 CFR § 19.4 ; 84 Fed. Reg. 2059, and contains a 5-year statute of limitations, 28 U.S.C. § 2462. And the availability of citizen suits only exacerbates the danger to ordinary landowners. Even when the EPA and the relevant state agency conclude that a permit is not needed, there is always the possibility that a citizen suit will result in a very costly judgment. The interpretation set out above, by providing a relatively straightforward rule, provides a measure of fair notice and promotes good-faith compliance.
B
The alternative way in which the statutory language could be interpreted-reading "from" to mean "originally from"-would lead to extreme results, as the Court recognizes. And while state regulation could fill any unwarranted gaps left by the interpretation I have outlined, there would be no apparent remedy for the overreach that would result from interpreting "from" to mean "originally from."
The extreme consequences of that interpretation are shown most dramatically by its potential application to ordinary homeowners with septic tanks, a problem that the EPA highlighted in a recent Interpretive Statement. See Interpretive Statement on Application of the Clean Water Act NPDES Program to Releases of Pollutants From a Point Source to Groundwater, 84 Fed. Reg. 16824 (2019). Septic systems-used by 26 million American homes-generally operate by "discharging liquid effluent into perforated pipes buried in a leach field, chambers, or other special units designed to slowly release the effluent into the soil." Id. , at 16812. That effluent then percolates through the soil and "can in certain circumstances ultimately enter groundwater." Ibid .[8] Congress most certainly did not intend that ordinary homeowners with septic systems obtain NPDES permits-or that they face severe penalties for failing to do so. That, however, is where this alternative interpretation would lead.
*1490 And the same is true for the test adopted by the Ninth Circuit. The Ninth Circuit held that a permit is required if a pollutant that reaches navigable waters is "fairly traceable," but there is no real difference between "fairly traceable" and "originally from." Unless a pollutant is "traceable" to a point source, how could that point source be required to get a permit? And the addition of the qualifier "fairly" does not seem to add anything. What would it mean for a pollutant to be "unfairly traceable" to a point source? Traceable only as a result of a method that is scientifically unsound? In that situation, why would a court consider the pollutant to be traceable to the source in question at all? So if a pollutant can be reliably determined to have originally come from a point source, a permit would appear to be required under the Ninth Circuit's test.
Respondents, instead of defending the Ninth Circuit's interpretation, argue that a discharge from a point source must be the "proximate cause" of a pollutant's reaching navigable waters. Brief for Respondents 12. But as the Court concludes, ante , at 1470 - 1471, there is no basis for transplanting this concept from the law of torts into the Clean Water Act, and it is unclear what it would mean in that context.
For these reasons, of the two possible interpretations of the statutory terms, the better is the interpretation that reads "from" to mean "directly from."
C
Even if the Court were to find § 1362(12) ambiguous, applicable clear statement rules foreclose the "functional equivalent" standard and favor the test just described. The Court has required a clear statement of congressional intent when an administrative agency seeks to interpret a statute in a way that entails "a significant impingement of the States' traditional and primary power over land and water use," Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers , 531 U.S. 159, 174, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ( SWANCC ), and when it adopts a new and expanded interpretation of a statute, Utility Air Regulatory Group v. EPA , 573 U.S. 302, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) ( UARG ). The same rules should apply here where what is at issue is a new theory propounded by private plaintiffs.
First, the Court's "functional equivalent" test unquestionably impinges on the States' traditional authority. In SWANCC , the Court struck down the Army Corps of Engineers' "Migratory Bird Rule" as inconsistent with the Clean Water Act because the rule effectively displaced state authority over land and water use. In this case, the federalism interest is even stronger because the Clean Water Act itself assigns non-point-source-pollution regulation to the States and explicitly recognizes and protects the state role in environmental protection. 33 U.S.C. § 1251(b). The "functional equivalent" standard expands federal point source regulation at the expense of state non-point source regulation. And as a practical matter, States would be saddled with the costs of increased NPDES permitting (because States generally award permits in place of the EPA), while exercising diminished control over non-point source pollution within their territory. See Brief for State of West Virginia et al. as Amici Curiae 27-34.
Second, the Court's test offends the clear-statement rule recognized in UARG by expanding the authority of the EPA. Congress must speak clearly if it "wishes to assign to an agency decisions of vast 'economic and political significance.' " 573 U.S. at 324, 134 S.Ct. 2427 (quoting *1491 FDA v. Brown & Williamson Tobacco Corp. , 529 U.S. 120, 160, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ). In UARG , the EPA had promulgated greenhouse-gas emission standards for stationary sources that "constitute[d] an 'unprecedented expansion of EPA authority that would have a profound effect on virtually every sector of the economy and touch every household in the land.' " 573 U.S. at 310-311, 134 S.Ct. 2427 (quoting 73 Fed. Reg. 44355 (2008) ). The statutory scheme, designed for large stationary sources like factories, would have been extended to smaller sources like hotels and retail establishments. The number of permits (and associated expenses) would have skyrocketed.
Here, as the EPA explained in a recent Interpretive Statement, the Fourth and Ninth Circuit "discharge" tests-which I struggle to distinguish from the "functional equivalent" formulation-broaden the Act's coverage to "potentially swee[p] into the scope of the statute commonplace and ubiquitous activities such as releases from homeowners' backyard septic systems." 84 Fed. Reg. 16823.
IV
The Court does little to justify its newfound standard, other than to point to certain past EPA enforcement actions, see ante , at 1472 - 1473, 1477, but the EPA's position on the regulation of groundwater has been anything but consistent. It is true, as the Court recounts, that the EPA has required NPDES permits for the discharge of some pollutants that migrate through groundwater before reaching navigable waters. See ante , at 1472 - 1473. But the EPA has contradicted itself on this important question multiple times. See Brief for Edison Electric Institute et al. as Amici Curiae 21-32 (reviewing EPA NPDES interpretations and permitting practices).
In the Act's earliest years, the EPA deputy general counsel wrote in a formal memorandum that "[d]ischarges into ground waters" do not require NPDES permits. Memorandum to EPA Region IX Regional Counsel 2-3 (Dec. 13, 1973).[9] More recently, the EPA recognized "conflicting legal precedents" on this question. Compare NPDES Permit Regulation and Effluent Limitation Guidelines and Standards for Concentrated Animal Feeding Operations (CAFOs), 68 Fed. Reg. 7216 (2003), with 66 Fed. Reg. 3018 (2001).
Similarly, in its 2019 Interpretive Statement, the EPA acknowledged its "[l]ack of consistent and comprehensive direction" on this issue. See 84 Fed. Reg. 16820 ; see also Brief for Edison Electric Institute et al. as Amici Curiae 21-32 (recounting EPA historical approach to NPDES permitting). But it added that "the best, if not the only, reading of the [Act] is that all releases to groundwater are excluded from the scope of the NPDES program, even where pollutants are conveyed to jurisdictional surface waters via groundwater." 84 Fed. Reg. 16814.
In short, the EPA's inconsistent position on the groundwater issue does not provide a sufficient basis for the Court's new "functional equivalent" test.
* * *
The Court adopts a nebulous standard, enumerates a non-exhaustive list of potentially relevant factors, and washes its hands of the problem. We should not require regulated parties to "feel their way on a case-by-case basis" where the costs of uncertainty are so great. Rapanos , 547 U.S. at 758, 126 S.Ct. 2208 (ROBERTS, *1492 C.J., concurring). The Court's decision invites "arbitrary and inconsistent decisionmaking." UARG , 573 U.S. at 350, 134 S.Ct. 2427 (ALITO, J., concurring in part and dissenting in part). And "[t]hat is not what the Clean [Water] Act contemplates." Ibid.
I would reverse the judgment below and instruct the lower courts to apply the test set out above. I therefore respectfully dissent.

EPA, FY 2018 State Underground Injection Control Inventory, https://www.epa.gov/uic/uic-injection-well-inventory; EPA, Hawaii NPDES Permits: Draft and Final NPDES Permits, https://www.epa.gov/npdes-permits/hawaii-npdes-permits.

Settlement Agreement and Order re: Remedies in No. 1:12cv198, Doc. 259 (Haw.); Stipulated Settlement Agreement Regarding Award of Plaintiffs' Costs of Litigation, ibid ., Doc. 267 (Haw.).

The Act defines a "pollutant" as:
"dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water ...." § 1362(6).

The Act defines "navigable waters" as "waters of the United States, including the territorial seas." § 1362(7). The term "navigable waters" has a well-known meaning, but the broader term "waters of the United States" is not defined by the Clean Water Act and has presented a difficult issue for this Court. See Rapanos v. United States , 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006). The EPA's definition of "waters of the United States" expressly excludes groundwater, see 40 CFR § 122.2 (2019) ; 84 Fed. Reg. 4190 (2019), and no party in this case disputes that interpretation.

Justice THOMAS describes his preferred holding in similar terms: "[A] permit is required only when a point source discharges pollutants directly into navigable waters." Ante , at 1479 (dissenting opinion). But I take Justice THOMAS's opinion to foreclose liability in one situation where I believe a permit would be required: a discharge from multiple, linked point sources. In my view, a permit is required in that instance because a pollutant would ultimately be added to navigable waters directly from a point source.
Justice Scalia's opinion in Rapanos , 547 U.S. at 743-744, 126 S.Ct. 2208 (plurality opinion), supports this conclusion. Rapanos addressed the meaning of the term "waters of the United States," and Justice Scalia's opinion concluded that this term does not apply to "[w]etlands with only an intermittent, physically remote hydrologic connection to [such waters]." Id ., at 742, 126 S.Ct. 2208. At one point in his opinion, Justice Scalia responded to the argument that this interpretation would allow polluters to evade the permit requirement "simply by discharging their pollutants into noncovered intermittent watercourses that lie upstream of covered waters." Id ., at 743, 126 S.Ct. 2208. Arguing that this was not likely to occur, he identified two lines of lower court authority that would prevent such evasion, but he did not endorse either. Ibid .
One of these lines was based on exactly the interpretation set out in this opinion, namely, that "such upstream, intermittently flowing channels themselves constitute 'point sources' " under the Act's broad definition of that term. Ibid . The other line, as described in Justice Scalia's opinion, "held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely [requires a permit] even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between." Ibid . (emphasis in original). To the extent these lower court cases are understood as holding that a permit is required whenever a pollutant "naturally" reaches waters of the United States, their reasoning would conflict with the Court's rejection of the theory that a permit is required whenever a pollutant that originated from a point source ultimately reaches covered waters. But as Justice Scalia noted, in the two cases he cited, the pollutants were discharged from point sources into "conveyances" that, in turn, brought the pollutants to covered waters. Ibid . And the conveyances in both cases, a sewer system and tunnel, ibid ., could easily fall within the broad definition of a point source.
In short, at least one and perhaps both of the lines of lower court cases to which Justice Scalia referred are fully consistent with the interpretation set out in this opinion. The same is true of his statement, discussed by Justice KAVANAUGH, ante , at 1478 - 1479 (concurring opinion), that the Clean Water Act "does not forbid the 'addition of any pollutant directly to navigable waters from any point source.' " 547 U.S. at 743, 126 S.Ct. 2208. As noted, Justice Scalia's opinion is open to the possibility that a permit is required if point source A discharges into point source B, and point source B then discharges into covered waters. Thus, his opinion apparently regards that situation as involving an indirect discharge. I would describe that discharge as direct because point source B discharges directly into covered waters, but the difference is purely semantic.

As we have said, the Act's point-source "definition makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters,' which are, in turn, defined as 'the waters of the United States.' " South Fla. Water Management Dist. v. Miccosukee Tribe , 541 U.S. 95, 105, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004). The label is a bit of a misnomer: Although labeled "point sources," "[t]ellingly, the examples ... listed by the Act include pipes, ditches, tunnels, and conduits, objects that do not themselves generate pollutants but merely transport them." Ibid. (citing § 1362(14) ).

The Act contains a number of references to groundwater (a non-point source) outside the NPDES context. The Act textually distinguishes groundwater from surface water and navigable waters, § 1252(a), provides funding for state regulation of groundwater pollution, and suggests that groundwater is a non-point source. See § 1329(h)(5)(D) (authorizing EPA to prioritize grants to States that have implemented or proposed "carry[ing] out groundwater quality protection activities which [EPA] determines are part of a comprehensive non[-]point source pollution control program").

According to the EPA, numerous other conveyances that deposit pollutants into groundwater could now require NPDES permits. "Activities listed by commentators included aquifer recharge, leaks from sewage collection systems, ... treatment systems such as constructed wetlands, spills and accidental releases, manure management, and coal ash impoundment seepage." 84 Fed. Reg. 16812. The County and amici also assert that respondents' theory would require permits for green infrastructure, water reuse, and groundwater discharge. See, e.g. , Brief for National Association of Clean Water Agencies et al. as Amici Curiae 20-26.

This early understanding, as the Court describes, is consistent with the legislative history, which shows that Congress intentionally left regulation of groundwater pollution to the States. See ante , at 1471 - 1472.